**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **RICARDO SALAZAR-LIMON,** | § | |
| **Individually and as Next Friend of** | § | |
| **EDGAR FRANCISCO SALAZAR AND** | § | |
| **SUSANA RENTERIA, Individually and** | § | |
| **as Next Friend of MARK BRAYAN** | § | |
| **SALGADO** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:12-03392** |
| | § | **(Jury Trial Demanded)** |
| | § | **Judge Lee H. Rosenthal** |
| **CHRIS C. THOMPSON, D.W. READY,** | § | |
| **J.G. HERRERA, T. VASHAW, J.B.** | § | |
| **SWEATT and C. BIGGER, Individually** | § | |
| **and in their Official Capacities, CITY** | § | |
| **OF HOUSTON, HOUSTON POLICE** | § | |
| **DEPARTMENT and JOHN DOES#1-5** | § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE LEE H. ROSENTHAL:

Defendants Chris Thompson, T. Vashaw, J.B. Sweatt, C. McClelland, and City of Houston files their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, requesting that this Court dismiss with prejudice all of Plaintiffs' claims against them.

### TABLE OF CONTENTS

TABLE OF CITATIONS………………………………………………………………… 3

LIST OF EXHIBITS…………………………………………………………………… 4

I.  NATURE AND STAGE OF PROCEEDING………………………………………… 5

II. ISSUES TO BE RULED UPON BY COURT………………………………………... 7

III. STANDARD OF REVIEW………………………………………………………... 7

IV. STATEMENT OF UNDISPUTED FACTS……………………………………………..8

V. ARGUMENT SUMMARY………………………………………………………15

VI. ARGUMENT……………………………………………………………………15

    A.    Thompson is entitled to qualified immunity as a matter of law on all claim arising under 42 U.S.C. § 1983……………………………………………………15

        1.    Thompson is entitled to qualified immunity on Plaintiff's excessive force claim……………………………………………………………17

        2.    Salazar-Limon's claim for unlawful arrest and seizure fails as a matter of law………………………………………………………….…..20

            a.    Salazar-Limon's claim is barred by *Heck*…………………21

            b.    Thompson is entitled to qualified immunity on the unlawful detention and unlawful arrest claim…………………………22

        3.    Salazar-Limon's Fourteenth Amendment Due Process claim fails as a matter of law…………………………………………………..22

        4.    Plaintiffs' claim for loss of familial society, companionship and association under 42 U.S.C. § 1983 fails as a matter of law……….23

    B.    Vashaw, Sweatt and McClelland are entitled to qualified immunity as a matter of law for Salazar-Limon's supervisory liability claims under 42 U.S.C. § 1983..24

    C.    Salazar-Limon cannot establish that the City of Houston is liable under 42 U.S.C. § 1983………………………………………………………………26

    D.    Salazar-Limon cannot establish a conspiracy claim under 42. U.S.C. § 1985..30

    E.    The state law claims against Thompson, Vashaw, Sweatt and McClelland should be dismissed pursuant to § 101.106(f) of the Texas Tort Claims Act…………31

    F.    Plaintiffs' negligence claims against the City are barred………………………32

    G.    Plaintiffs cannot recover for loss of consortium under state law because all state law claims are barred………………………………………………………...34

    H.    Damages……………………………………………………………………35

        1.    Plaintiffs' claim for exemplary damages against the City of Houston is barred……………………………………………………………35

        2.    Plaintiffs are not entitled to the damages they seek……………………35

VII. CONCLUSION AND PRAYER…………………………………………………….35

# TABLE OF CITATIONS

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)…………………………………………7

*Brown v. City of Houston,* 337 F.3d 539 (5th Cir. 2003)………………………………7

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)……………………….…………………7

*City of LaPorte v. Barfield,* 898 S.W.2d 299 (Tex. 1995)……………………………35

*City of St. Louis v. Praporotnik,* 485 U.S. 112 (1988)….…………….…………………29

*Clark v. American's Favorite Chicken,* 110 F.3d 295 (5th Cir. 1997)…………………8

*Connick v. Thompson,* 131 S.Ct. 1350 (2011)……………………………………………27

*Cronen v. Ray,* Nos. 14-05-00788-cv, 14-05-00789-CV, 2006 WL 2547989

    (Tex. App. Hous. (14th Dist.)……………………………………………………35

*Duckett v. City of Cedar Park, Tx.,* 950 F.2d 272 (5th Cir. 1992)……….………………7

*Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375

    (5th Cir. 2005)……………………………………………………………………24, 25, 28

*Evans v. City of Houston,* 246 F.3d 344 (5th Cir. 2001)………………………………7

*Garrick v. Thibodeaux,* 174 F.3d 198 (5th Cir. 1999)…………………………………21

*Graham v. Connor,* 490 U.S. 386 (1989)………………………………………………17, 23

*Guidry v. City of Houston,* C.A. H-11-1589, 2011 WL 211114

    (S.D. Tex. Jan. 17, 2013)…………………………………………………………29

*Hamilton v. Seque Software,* 232 F.3d 473 (5th Cir. 2000)……………………………7

*Heck v. Humphrey,* 512 U.S. 477 (1994)………………………………………………21

*Holland v. City of Houston,* 41 F.Supp.2d 678 (S.D. Tex. Jan. 7, 1999)…………….26,32,33

*Mays v. TSI Staffing, Inc.*, 56 F.Supp. 2d 738 (E.D. Tex – Jun. 15, 1999)………….....30

*Meinecke v. H&R Block of Houston,* 66 F.3d 77 (5th Cir. 1995)…………………………....7

*Molette v. City of Alexandria,* C.A. No. 040501A, 2005 WL 2445432

    (W.D. La. Sept. 30, 2005)…………………………………………………………..23

*Pearson v. Callahan*, 555 U.S. 223 (2009)………………………………………………....15

*Peterson v. City of Fort Worth, Tx.,* 588 F.3d. 838 (5th Cir. 2009)………………………..26,27

*Pineda v. City of Houston,* 291 F.3d 325 (5th Cir. 2002)……………………………………..29

*Roberts v. City of Shreveport,* 397 F.3d 287 (5th Cir. 2005)…………………………………25

*Scott v. Harris*, 550 U.S. 372 (2007)……………………………………………………………16

*Swilley v. City of Houston,* 457 Appx. 400, 404 (5th Cir. 2012)………………………………31

*Thompson v. Johnson*, 348 Fed.Appx. 919 (5th Cir. 2009)…………………………………15

*Tolan v. Cotton,* 713 F.3d 299 (5th Cir. 2013)……………………………………15,16,19,20

*University of Texas Medical Branch at Galveston v. Hohman,* 6 S.W.3d 767 (Tex. App. -

    Houston [1[st] Dist.] 1999)……………………………………………………………31

*Washington v. Allstate Ins. Co.,* 901 F.2d 1281 (5th Cir. 1990)……………………………..8

Tex. Civ. Prac. & Rem. Code Ann. § 101.021………………………………………………32

Tex. Civ. Prac. & Rem. Code Ann. § 101.024………………………………………………35

Tex. Civ. Prac. & Rem. Code. Ann. § 101.057…………………………………………..…34

Tex. Civ. Prac. & Rem. Code Ann. §101.106(f) ……………………………………………32

## LIST OF EXHIBITS

Exhibit A – Deposition Excerpts of Officer Christopher Thompson

Exhibit A-1 – Officer Christopher Thompson Certification Records

Exhibit A- 2 – Officer Christopher Thompson Complaint History

Exhibit B – Deposition Excerpts of Ricardo Salazar Limon

Exhibit C – Deposition Excerpts of Keith Allen Howse

Exhibit C-1 – Keith Allen Howse Report

Exhibit D – Deposition Excerpts of Lt. T. J. Allen

Exhibit D-1 – Lt. T.J. Allen Certification Records

Exhibit D-2 – Investigation Summary:  IAD# 37927-2010, T.J. Allen

Exhibit E – Deposition Excerpts of Sr. Officer Terry A. Bratton

Exhibit E-1 - Sr. Officer Terry A. Bratton Report

Exhibit F – Deposition Excerpts of Asst. Chief Mattie C. Provost

Exhibit F-1 - Asst. Chief Mattie C. Provost Report

Exhibit G- Deposition Excerpts of Sgt. Thomas Vashaw

Exhibit G-1 –Sgt. Thomas Vashaw Certification Records

Exhibit H- Deposition Excerpts of Sgt. John B. Sweatt

Exhibit H-1- Sgt. John B. Sweatt Certification of Records

## I.    NATURE AND STAGE OF PROCEEDINGS

On October 30, 2010, Plaintiff Ricardo Salazar-Limon ("Salazar-Limon") was stopped by Houston Police Officer Chris Thompson ("Thompson") for speeding on Houston's Southwest Freeway on the overpass which runs over Wesleyan Street below.  Thompson attempted to detain Salazar-Limon for purposes of conducting a DWI investigation.  When Thompson attempted to handcuff Salazar-Limon to do a quick search and transport him to a safe location to conduct the DWI investigation, Salazar-Limon spun around before Thompson had the handcuffs out and began pushing Thompson into oncoming traffic on the Southwest Freeway.  Thompson, who was in fear for his life, was able to maintain his balance and began to struggle with Salazar-Limon to get control of his hands and the two eventually ended up on the retaining wall.  Once at

the retaining wall, the two continued to struggle, with Salazar-Limon attempting to push Thompson over the retaining wall.  Salazar-Limon eventually broke away from Thompson and proceeded to walk back in the direction of his truck.  Thompson pulled his weapon and order Salazar-Limon to show his hands and to stop.  Salazar-Limon ignored Thompson's commands and continued to walk back to his truck.  Soon thereafter, Salazar-Limon moved his hands toward his waistband area and began to turn his body in the direction of Thompson.  Thompson, in fear for his life, fired his weapon once, striking Salazar-Limon in the lower, right hand side of his back.  Salazar-Limon was charged with and pled guilty to resisting arrest and DWI.  As a result of the shooting, Salazar-Limon is partially paralyzed.

On October 26, 2012, Salazar-Limon, individually and as next friend of Edgar Francisco Salazar and Suzan Renteria, individually and as next friend of Mark Brayan Salgado filed their original petition in Cause No. 2012-63343 in the 190th District Court of Harris County, Texas naming and serving the City of Houston, Houston Police Department, D.W. Ready, T. Vashaw, J.G. Herrera, J.B. Sweatt, C. Bigger, Thompson and John Does #1-5 as defendants.   On November 16, 2012, Defendants removed this action to this Court.  (d/e 1, Notice of Removal). Defendants filed their Answer on December 5, 2012.  (d/e 2, Answer).  On March 1, 2013, Plaintiffs filed an Amended Complaint, suing Thompson, Ready, Herrera, Vashaw, Sweatt, Bigger, Charles McClelland, individually and in their official capacities, City of Houston, and John Does #2-5.  (d/e 13, Amended Complaint, "Amend. Compl.").  Defendants filed their Answer to the Amended Complaint on March 19, 2013.  (d/e 14, Answer to 1st Amend. Compl.). On January 31, 2014, Plaintiffs filed their Stipulation of Voluntary Dismissal, dismissing Ready, Herrera and Bigger, individually and in their official capacities, from the lawsuit.  (d/e 27,

Stipulation of Voluntary Dismissal).  The Court entered its order on February 3, 2014, granting the partial dismissal.  (d/e 28, Order).

## II.    ISSUES TO BE RULED UPON BY THE COURT

1.    Did the Defendants establish that they are each entitled to qualified immunity?

2.    If each Defendant has established that he is entitled to qualified immunity, can Plaintiffs rebut the defense and establish a necessity for trial?

3.    Is the City of Houston liable for the alleged constitutional violations because its customs, practices, policies or procedures were adopted with deliberate indifference and were the moving force behind alleged constitutional violations?

4.    Did Plaintiffs establish a conspiracy claim under 42 U.S.C. § 1985?

5.    Are Defendants entitled to immunity for Plaintiffs' state law claims?

6.    Can the Plaintiffs establish a claim for damages?

## III.    STANDARD

The moving party is entitled to summary judgment if the pleadings, discovery, disclosure materials on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); FED.R.CIV.P. 56(c). The moving party has the burden of demonstrating that absence of genuine issue for trial.  *Duckett v. City of Cedar Park, Tx.,* 950 F.2d 272, 276 (5th Cir. 1992). The burden then shifts to the non-moving party to show with "significant probative evidence" that a genuine issue of material fact exists.  *Hamilton v. Seque Software,* 232 F.3d 473, 477 (5th Cir. 2000) (*quoting Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir. 1994)). Facts are considered material if they might affect the outcome of the lawsuit under the governing law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986). When considering evidence, all reasonable inferences are to be resolved in favor of the non-moving party.  *Evans v. City of Houston,* 246 F.3d 344, 348 (5th Cir. 2001).

However, the non-movant must show more than "some metaphysical doubt as to material facts." *Meinecke v. H&R Block of Houston,* 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation or only a scintilla of evidence will not carry this burden. *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003). Likewise, unsupported allegations, affidavits, or deposition testimony asserting ultimate or conclusory facts and conclusions of law are also not sufficient to defeat a motion for summary judgment. *Clark v. American's Favorite Chicken,* 110 F.3d 295, 297 (5th Cir. 1997). Where the record, taken as a whole, indicates that no reasonable jury could return a verdict for the non-movant, there is no genuine issue for trial. *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1286 (5th Cir. 1990).

## IV.    STATEMENT OF UNDISPUTED FACTS

## BACKGROUND

*CHRISTOPHER THOMPSON*

1.    Defendant Christopher C. Thompson ("Thompson") is currently a police officer with the City of Houston Police Department ("HPD").   (Ex. A, Deposition of Christopher Thompson ("Thompson Dep."), p. 6).   Thompson has been employed with HPD for seven years. *Id.*

2.    In October 2010, Thompson's chain of command was as follows:  Sgt. Sweatt, Lieutenant Boyd, Captain Boyd, a line-up of chiefs, and then Chief McClelland.  (Thompson Dep., p. 17).  Sweatt was his immediate supervisor. *Id.* at p. 20.

3.    Vashaw was in charge of Thompson's training as a night shift training sergeant. (Thompson Dep., p.19).   Vashaw was not actively involved in any training with Thompson around October 2010. *Id.*

4.    Thompson attended training at HPD's training academy beginning June 26, 2006. (Thompson Dep., p. 29).  He was in Class 188. *Id.*  The academy was a 6 month course. *Id.*  Thompson was in class 40 hours a week for 6 months, give or take a few holidays. *Id.*   The basic police officer class he received in the academy was mandated by TCOLE. (Thompson Dep., p. 34).

5.    An integral part of the training Thompson received as a cadet was the defensive tactics training.   (Ex. E, Deposition of Terry Bratton ("Bratton Dep."), p.18.    The instructor

would have gone over 600-17, which is the use of force training with Thompson.  *Id.*  He would have also been placed in some scenario-based training during field problems.  *Id.*  The field problems would have dealt with decision-making as well as some of the training received in defensive tactics and firearms.  *Id.*  There are other various aspects of law, the Penal Code, Constitutional Law and other things that are in that Basic Peace Officer course that is required by the State.  *Id.*

6.      After the academy, Thompson is required to obtain 40 hours of in-service training each year.  (Bratton Dep., p.24).  A true and accurate copy of his in-service training records are attached as Exhibit A-1.  (Thompson Dep., pp. 33-34).  Some of the courses Thompson took as in-service training would have included use of force.  (Bratton Dep., pp. 19-24).

7.      Thompson is aware of general orders that deal with firearm safety.  (Thompson Dep., p. 48).  Thompson received training in conducting DWI investigations.  (Thompson Dep., p. 106).  Thompson received shoot/don't shoot training.  (Thompson Dep., p. 62).  This training involved a simulator.  (Thompson Dep., p. 62).  He went through this training twice.  (Thompson Dep., p. 63).  He also received night time low light training while at the Academy.  (Thompson Dep., p. 64-65).  Thompson received training on actively fleeing suspects.  (Thompson Dep., p. 67).  Thompson would have received low-light firearms training in the Tactical Pistol course, the shoot/don't shoot situational training, the field problems while at the academy, and through the simulator.  (Bratton Dep., 131).

8.      Prior to Thompson's interaction with Salazar-Limon, Thompson had only been involved in two other shootings – both involving dogs.  (Ex. A-2, Thompson's Complaint History)

*JOHN SWEATT*

9.      Sweatt was a part of HPD Academy Class 159.  (Ex. H, Deposition of John Sweatt ("Sweatt, Dep."), p. 14.  He was sworn as an officer in December 1994.  *Id.*

10.     Sweatt has been at South Central patrol the majority of his time in the rank of sergeant.  (Sweatt Dep., p. 38).

11.     When Sweatt came out of the academy, he was given a set of general orders.  (Sweatt Dep., pp. 39-40).  He was given another set general orders when he promoted.  It is the responsibility of every officer to take the new general orders as they are released and remove the old general orders.  An officer will only have one copy of a particular general order.  He replaces the outdated ones with the new ones.  *Id.*  Officers are notified at roll call that there is a new general order.  When an officer signs in to his time sheet, the system will let him know that a new general order is available.  The department keeps track of when officers read new general orders.  *Id.*

12.     Sweatt was Thompson's supervisor about a year while Thompson was at South Central.  (Sweatt Dep., pp. 109-110).  Sweatt thought Thompson did a very good job and was very cooperative with supervisors and officers.  (Sweatt Dep., pp. 110-11).  He always worked a lot of traffic and was available to take calls.  *Id.*  Sweatt interacted with Thompson a

couple of times a week. (Sweatt Dep., p. 111). He never had any issues with what he saw Thompson doing when he stopped by scenes. *Id.* Thompson did not come to Sweatt about any issues he was having. *Id.* He does not recall having any supervisory interventions with Thompson. *Id.*

13. He is not aware of any shooting incidents that Thompson was involved in, other than the Salazar-Limon shooting, while Thompson was under his command. (Sweatt Dep., p. 114). Thompson's shooting in 2011 occurred after he left Sweatt's supervision. *Id.*

*THOMAS VASHAW*

14. Thomas Vashaw is currently employed with the Houston Police Department. (Ex. G, Deposition of Thomas Vashaw ("Vashaw Dep., 6). He began his employment with HPD in March 1982. (Vashaw Dep., 8).

15. Vashaw was not actively involved in Thompson's training around October 2010. (Thompson Dep., p. 19). Vashaw oversaw the training of the probationary officers. (Thompson Dep., p. 20). Vashaw was a field training supervisor. (Vashaw Dep., p. 32).

16. When an officer comes out of the academy, they are placed in the Field Training Program. (Vashaw Dep., p. 28). In 2007, the field training program consisted of four phases. *Id.* If a probationary officer did not perform well in a particular category, the officer would go through Phase V – another 3-week training program and Phase VI – another 2-week evaluation period. (Vashaw Dep., p. 29).

*CHARLES MCCLELLAND*

17. McClelland became Chief of the Houston Police Department sometime in 2010. (Ex. F, Deposition of Mattie Provost ("Provost Dep., 21). The policymaker for HPD is the Chief of Police. (Provost Dep., 25).

18. The chief of police has to approve all changes in training. (Provost Dep., p. 49). The Chief mandates what training is going to be on a yearly basis. *Id.*

## HPD POLICIES AND PROCEDURES

19. Cadets at HPD's Academy are provided with a copy of all of HPD's general orders. (Thompson Dep., pp. 45-46). The cadets reviewed some of the general orders throughout the Academy. *Id.* at p. 46. After the Academy, officers are provided updates periodically to the general orders. *Id.* The general orders are also located online. *Id.* Officers are notified of new general orders by e-mail and at roll call. *Id.* at p. 47.

20. HPD General Order 600-17 sets forth the Department's policy on use of force. (Provost Dep., p. 36). The policy allows the officer to have discretion as to when he can use force. (Provost Dep., p. 46). If the officer feels his life is in danger or someone else's life is in danger of death or seriously bodily injury, then the officer is authorized to use deadly force. (Provost Dep., pp. 46-47).

21.     There are approximately 5300 police officers in the Houston Police Department. (Provost Dep., p. 48).  53% of those police officers are patrol officers.  *Id.*

22.     HPD has a Personal Concerns Committee.  (Provost Dep., p. 110-111).  Officers who need closer supervision or a supervisor sees that an officer continues to commit the same infractions over and over and over again are recommended to the Committee. *Id.*  If an officer has four or more IAD complaints in a 12 month period, including multiple use of force complaints then the officer will be flagged for the Committee.  *Id.*

**HPD TRAINING**

23.     The department requires officers go through their mandatory training every year. We require 40 hours a year; the State requires 20 a year.  (Bratton Dep., 24).

24.     A cadet goes through the Basic Peace Officer training at the academy.  (Bratton Dep., 25).  While in the academy, cadets are taught the courses, including courses on use of force, which are mandated by TCLEOSE/TCOLE.  (Bratton Dep., 18).  The cadets go through field training problems just prior to graduating from the academy.  (Bratton Dep., p. 29).  There are seven different phases of field problems.  *Id.*  After the academy, the officer then goes through the field training program.  (Bratton Dep., p. 26).

25.     HPD policy requires officers to limit their use of force and physical contact to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control.  (Bratton Dep., p. 91).  The training is for the officer to be able to articulate the necessity why he used force based on the amount of force based on the totality of that scenario.  (Bratton Dep., p. 92).  If the office perceives an immediate or imminent threat of serious bodily injury or death, then the officer is not required by policy to use an intermediate weapon first.  *Id.*

**OCTOBER 29-30, 2010**

26.     Thompson began his shift at 11:00 p.m.  (Thompson Dep., p.80).   He would have begun his shift at roll call at South Central station.  *Id.*  On average, roll call lasts about 10 minutes.  *Id.* at 81.  Thompson was wearing his HPD uniform.  *Id.* at 98.

27.     Thompson logged on the mobile data terminal (MDT) in his police car at 11:32 p.m. that night.  *Id.* at 83.  He first positions himself in his police car at the overpass at 59 and Montrose.  *Id.* at 87.  Thompson performs two traffic stops – one at 11:38 p.m. and another one at 11:47 p.m.  *Id.*

28.     Salazar-Limon arrived home from work about 7:00 or 8:00 p.m.  (Salazar-Limon Dep., p. 11).  When he arrived home he began drinking with his friend, Rogelio.  (Salazar-Limon Dep., p. 11).  He has two or three Coronas.  (Salazar-Limon Dep., p. 11).  He and Rogelio then went to get something to eat and went to the home of other friends – Ivan and Jose. (Salazar-Limon Dep., p. 12).  On the way, Rogelio and Salazar-Limon picked up a 12-pack of Bud Light.  (Salazar-Limon Dep., pp. 13-14).  They arrived at the home of Ivan and Jose about 10:00 p.m.  (Salazar-Limon Dep., p. 13).   They continued to drink.  (Salazar-Limon Dep., p. 13).  Salazar-Limon had consumed more beer.  (Salazar-Limon

Dep., pp. 13, 14).  Around 11:00 p.m. they all left to go to the home of Carlos, another friend.  (Salazar-Limon Dep., p. 15).  They took the beer with them.  (Salazar-Limon Dep., p. 15).  Salazar-Limon was driving a 1997 Toyota T100 truck that was white with tinted windows and consisted of a cab and a half.  (Salazar-Limon Dep., p. 15).  Salazar-Limon was driving; Rogelio was in the passenger seat to his right; Jose and Ivan were in the back in the cab.  (Salazar-Limon Dep., p. 16).

29.     Thompson was positioned at 59 outbound and Kirby when he first sees Salazar-Limon speed by him.  (Thompson Dep., p. 89); (Salazar-Limon Dep., p. 18).  Thompson saw Salazar-Limon weaving through traffic and speeding in comparison to the other cars on 59.  *Id.* at 89-90.  He was able to determine that Salazar-Limon was travelling at a high rate of speed.  *Id.* at 90.  Salazar-Limon suspects he was going about 70 or 75 miles per hour.  (Salazar-Limon Dep., p. 16).  Thompson ran his laser and determined that Salazar-Limon was driving at 83 miles per hour.  (Thompson Dep., 90).  When Thompson clocked Salazar-Limon, Salazar-Limon was traveling in the left lane, which is the fast lane everybody understands as so he'll change lanes more to the right to go around other cars.  *Id.* at 92.  Thompson was positions in the outside shoulder on the far right.  *Id.*

30.     Thompson turned on his lights and sirens to stop Salazar-Limon.  (Thompson Dep., p. 93); (Salazar-Limon Dep., p. 18).  It took under a minute for Salazar-Limon to stop his vehicle.  (Thompson Dep., p. 95); (Salazar-Limon Dep., p. 19).  Salazar-Limon and Thompson pulled into the right shoulder.  (Thompson 96; Salazar-Limon Dep., p. 19).  They were stopped on the overpass.  (Salazar-Limon Dep., p. 19).  No part of Salazar-Limon's truck was in the lace of traffic.  *Id.* at 97.  Thompson stops his police car at an angle about 4 feet behind his truck – enough to see his license plate.  *Id.* 97 (Salazar-Limon Dep., p. 25).

31.     Plaintiffs' expert agrees that stops performed on overpasses are not recommended because of traffic and officer safety.  He concedes that sometimes this cannot be helped.  (Howse Dep., pp. 72, 74).

## TRAFFIC STOP

32.     At 12:05 and 4 seconds, Thompson's MDT indicates that he is on a traffic stop.  (Thompson Dep., p. 91).  Thompson believes he already had Salazar-Limon pulled over and stopped.  *Id.*  Thompson first runs his plates to make sure he was not wanted for felony murder or whatnot.  *Id.* at pp. 97-98.  The reason for the stop was speeding.  *Id.* at 105.

33.     Salazar-Limon admits that he was driving above the speed limit and that this was a violation of the law.  (Salazar-Limon Dep., p. 35).  Salazar-Limon believes that an officer would have the right to stop him for this and inquire as to what he was doing.  (Salazar-Limon Dep., p. 35).

34.     Thompson gets out of his police car and approaches Salazar-Limon's vehicle.  (Thompson Dep., p. 98).  Salazar-Limon rolls his window down and Thompson addresses

who he is and why he pulled him over.  (Thompson Dep., 98) (Salazar-Limon Dep., p. 19).  Thompson could smell alcohol.  *Id.* at 100.

35.    Thompson asked Salazar-Limon for his driver's license.  (Thompson Dep., 98)(Salazar-Limon Dep., pp. 19-20).  Salazar-Limon displayed a Mexican-something ID.  (Thompson Dep., 99)(Salazar-Limon Dep., p. 20).  Thompson asked Salazar-Limon for his insurance.  *Id.*   Salazar-Limon provided him with his insurance.   *Id.*  Salazar-Limon appeared to understand what he was saying.  (Thompson Dep., p. 98)( Salazar-Limon Dep., p. 38).

36.    Thompson walked backed to his vehicle and ran his name and it was clear.  (Thompson Dep., p. 99)(Salazar-Limon Dep., p. 22).  Thompson walks back to Salazar-Limon's vehicle and asks him to get out of the truck.  *Id.* at 101 (Salazar-Limon Dep., p. 23).  Salazar-Limon complies with the request.  *Id.*  Salazar-Limon checks to make sure no cars were coming before he exited his truck and walked back to Thompson.  (Salazar-Limon Dep., p. 33).  They walk back toward his police car and they ended up walking between his police car and Salazar-Limon's truck.  *Id.*  When they stopped, Thompson's back was to 59 and Salazar-Limon was facing Thompson in the direction of traffic.  *Id.* at 104.  Salazar-Limon could not see what Rogelio, Ivan and Jose were doing in the truck at this point.  (Salazar-Limon Dep., p. 33).  Salazar-Limon could not see their hands.  (Salazar-Limon Dep., p. 33).

37.    In a slightly raised voice, to speak over the noise of traffic, Thompson tells Salazar-Limon that he needed to do an investigation of a DWI.  (Thompson Dep., p. 104).  Thompson tells him to turn around and put his hands behind his back.  *Id.*  [complies].  Thompson was not placing under arrest at this time.  *Id.*  He was detaining him for a DWI investigation.  *Id.*

38.    Thompson was authorized to detain Salazar-Limon in order to investigate the possibility that Salazar-Limon was driving while intoxicated.  (Howse Dep., pp. 71-72; 74-75).  Given that Thompson was along and there were still three other male passengers still inside the pickup, a reasonable peace officer would find it prudent to attempt to handcuff Salazar-Limon as part of a temporary detention and subsequent criminal investigation to ensure officer safety.  (Howse Dep., pp. 75-76).

## **STRUGGLE**

39.    Salazar-Limon was wearing an untucked button-down shirt that stopped at the top of his thighs, blue pants and dress shoes.  (Salazar-Limon Dep., pp. 36-37).  When Thompson attempts to take Salazar-Limon's hand to place handcuffs on him, Salazar-Limon pulls his hand away from Thompson.  (Salazar-Limon Dep., pp. 24, 26).  Salazar-Limon turns his back to Thompson and begins to walk away.  (Salazar-Limon Dep., p. 26).  Salazar-Limon walked away because he was scared.  (Salazar-Limon Dep., pp. 26, 32).  Thompson did not search Salazar-Limon.  (Salazar-Limon Dep., p. 32)  Thompson had not searched Salazar-Limon's truck before this point.  (Thompson Dep., p. 114)(Salazar-Limon Dep., p. 32).  Salazar-Limon did not see Thompson search Rogelio, Ivan, or Jose.  (Salazar-Limon Dep., p. 32).

40.     Thompson orders Salazar-Limon to "stop" and "stop right here."  (Salazar-Limon Dep., p. 27).  Salazar-Limon does not comply and takes one or two more steps.  (Salazar-Limon Dep., pp. 28, 29)

## SHOOTING

41.     Not much time passed between the time Salazar-Limon was initially stopped by Thompson and when he was shot.  (Salazar-Limon Dep., p. 31).  It was less than 10 minutes.  (Salazar-Limon Dep., p. 31).  Everything happened fast.  (Salazar-Limon Dep., pp. 31, 37).

42.     If the events had not occurred as above, Thompson had planned to handcuff Salazar-Limon and place him in the patrol car.  (Thompson Dep., pp. 104-105).  Because he noted the three other passengers in the truck and no one else had a driver's license, Thompson was going to need to get another unit to come out and place the passengers in their police vehicles and call a tow truck so that they could go to a gas station at the next exit.  *Id.* at 105.

43.     Thompson was not able to perform any field sobriety test or arrest Salazar-Limon.  (Thompson Dep., p. 105).

## INVESTIGATION

44.     Lieutenant Timothy Allen ("Allen") was a lieutenant in the Internal Affairs Department at the time the investigation into the events which form the basis of this lawsuit occurred.  (Allen Dep., pp. 9-10).  Allen began with HPD in 1981.  (Allen Dep., p. 6).

45.     The two years Allen was in IAD he investigated no less than 20 officer involved shootings.  (Allen Dep., p. 26).  In reviewing officer-involved shootings, Allen is looking for whether or not the officer followed HPD's policy regarding the use of deadly force.  (Allen Dep., p. 26).  Specifically, he is trying to determine if the officer used force for the protection of their life or that of another and that there was a reasonable belief that serious bodily injury or death was imminent.  (Allen Dep., pp. 26, 28).  He used HPD policy to make that determination.  (Allen Dep., pp. 26-27).  He also relied on his training that he received in the academy as a cadet and in-service training received throughout his over 25 years in the department.  (Allen Dep., p. 27).

46.     In reviewing the investigation into this shooting, Allen did not find evidence that Thompson committed any policy violations.  (Allen Dep., p. 49).

47.     Allen suspected that Salazar-Limon was turning towards the right at or near the time he was shot based on the medical records in the investigation.  (Allen Dep., pp. 72-74).  Specifically, the entry wound of the bullet was located in Salazar-Limon's lower right back and the bullet lodged in his L1 spine.  *Id.*  This caused him to draw the conclusion that the bullet entering in his side was consisted with a turn.  *Id.*

## CRIMINAL CASE

48.     Salazar-Limon entered a plea of guilty for resisting arrest and DWI.  (Salazar-Limon Dep., p. 40).  He was told he could not drive for a year.  (Salazar-Limon Dep., p. 40). Salazar-Limon just paid fines.  (Salazar-Limon Dep., p. 40).

## V.     ARGUMENT SUMMARY

Defendants Thompson, Sweatt, Vashaw, McClelland, and the City of Houston are entitled to summary judgment as a matter of law.  The individual Defendants in their individual and official capacities are entitled to qualified immunity.  Plaintiffs cannot rebut Defendants immunity assertion with competent and admissible summary judgment evidence.  The City of Houston is likewise entitled to summary judgment because Plaintiffs cannot establish that a deprivation of Plaintiffs' constitutional rights was inflicted pursuant to an official policy or custom and that that policy or custom was the proximate cause of Plaintiffs' injuries.  Finally, the state law claims against the individual defendants should be dismissed as those claims should have been brought against the City.  In turn, all state law claims against the City are barred based on sovereign immunity.

## VI.     ARGUMENT

### A.     Thompson is entitled to qualified immunity for Plaintiff's Fourth Amendment Claims

"Qualified immunity promotes the necessary, effective, and efficient performance of governmental duties by shielding from suit all but the plainly incompetent or those who knowingly violate the law." *Tolan v. Cotton,* 713 F.3d 299, 304 (5th Cir. 2013).     Qualified immunity involves a two-prong test to determine whether an official is entitled to a qualified immunity defense. *Thompson v. Johnson*, 348 Fed.Appx. 919, 922 (5th Cir. 2009)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  First, the court must determine if the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  *Id.*  Second, if a constitutional right has been violated, the court must ask

whether the right was clearly established. *Id.* The inquiry into whether the individual officers are entitled to qualified immunity turns on the objective reasonableness of their actions in light of the legal rules clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 243 (2009). If the conduct did not violate a constitutional right, there is no need to address the second prong of the qualified immunity analysis. *Id.* at 922. Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to rebut its applicability. *Tolan,* 713 F.3d at 304.

The U.S. Supreme Court holds that when resolving the questions of qualified immunity at the summary judgment stage, the District Court need not view facts favorable to the plaintiff when the record as a whole cannot lead a rational trier of fact to find for the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

Plaintiffs allege that Thompson deprived Salazar-Limon of rights guaranteed by the Fourth and Fourteenth Amendment to the Constitution when Thompson allegedly used excessive force by shooting Salazar-Limon. Plaintiffs also allege that Thompson's arrest and detention of Salazar-Limon were unlawful and in violation of his Fourth Amendment rights. Finally, Plaintiffs allege that Thompson's actions deprived Salazar-Limon's parents, friends, and family of the life-long love, companionship, support, society, care and sustenance of Salazar Limon. (d/e 13, Amend. Compl., pp. 9-13). Thompson did not violate Plaintiffs' constitutional rights and his actions were objectively reasonable considering the facts and circumstances he faced.

1.    **Thompson is entitled to qualified immunity on Plaintiff's excessive force claim.**

In an excessive force case, a plaintiff is first show that he has an injury that resulted from the use of force that was clearly excessive to the need and excessiveness was clearly unreasonable. *Tolan,* 713 F.3d at 304. Second, plaintiff must show that the allegedly violated constitutional rights were clearly established at the time of the incident, and, if so, whether the defendant's conduct was objectively unreasonable in light of the clearly established law at the time. *Id.* at 305.

The proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight. *Id.* The analysis of reasonableness must consider allowances for the fact that police officers are often forced to make split second decisions about the amount of force that is necessary in situations that are tense, uncertain and rapidly evolving. *Id.* at 396-97.

Plaintiffs assert that a reasonable officer in Thompson's position would understand that the use of lethal or deadly force by Thompson in apprehending Salazar-Limon, an unarmed individual, would violate Salazar-Limon's clearly established constitutional rights under the Fourth Amendment. Plaintiffs allege that at no time during the events described herein did Thompson possess justification or excuse to use deadly force against Salazar-Limon. Plaintiffs' assertions are not supported by the undisputed evidence in the record.

When Thompson attempted to handcuff Salazar-Limon to detain him for a DWI investigation, Salazar-Limon pulls his hand away from Thompson.   While in the narrow emergency lane on an overpass of a busy expressway, Salazar-Limon attempted to push Thompson into the lanes of traffic.  The struggle eventually moves away from the lanes of traffic and ends up near the retaining wall where Thompson felt that Salazar-Limon was attempting to push him over the wall because Thompson was leaning on the wall more so than he.  (Thompson Dep., pp. 177-78).   Thompson had to brace himself to keep from toppling over the wall. (Thompson, Dep., p. 178).   During the struggle, Thompson was able to see cars passing on Wesleyan Street below.   (Thompson Dep., p.178).   Plaintiffs' expert, Howse, opined that Thompson had the legal right to detain Salazar-Limon and that Thompson attempted to regain control of him by trying to use reasonable force to grab him.  (Howse Dep., p. 97).   Howse interpreted the facts to suggest that a pushing and pulling match occurred between Thompson and Salazar-Limon. (Howse Dep., pp. 97-98).   Salazar-Limon's own expert states that Salazar-Limon resisted arrest and that alone is illegal.  (Howse Dep., p. 98). Indeed, Salazar-Limon pled guilty to resisting arrest.  Salazar-Limon's self-serving testimony that all he did was pull his hand away from Thompson and walk away is contradicted by the undisputed evidence in the record and by his own expert.  Salazar-Limon eventually breaks from the struggle with Thompson and turns to walk back towards his truck along the passenger side of the truck.  (Thompson Dep., p. 113).   Thompson immediately pulled his weapon and index his finger.  (Thompson Dep., pp. 113, 115).   Thompson pulled his weapon because he was thinking, "this guy tried to push me in traffic, he tried to push me over the bridge, I need my gun.  I haven't searched him.  He has a long shirt.  He's pushing away for a reason."  (Thompson Dep., p. 114).   Thompson was operating on his training and his experience back in 2008 where an officer does not have an

opportunity to search someone and that person pulls a gun in his face before the officer can get his gun out of his holster.  (Thompson Dep., p. 114).  Thompson ordered Salazar-Limon to stop and show his hand twice.  (Thompson Dep., p. 115).  It is not until Thompson sees Salazar-Limon make a motion towards his waistband and turns and looks at Thompson.  (Thompson Dep., pp. 115-116).  Salazar-Limon made a motion towards his waistband that is similar to a person reaching for a cell phone on his waistband.  (Thompson Dep., p.116).  Salazar-Limon made the same motion as a suspect drawing a weapon.  (Thompson Dep., pp. 117-118).

The following facts are undisputed:  (1) Salazar-Limon had been drinking prior to operating his vehicle; (2) Salazar-Limon was stopped because he was driving above the speed limit; (3) Salazar-Limon had an open case of beer in his vehicle; (4) the traffic stop occurred in a narrow emergency lane on a busy freeway, around midnight; (5) there was very limited lighting no the overpass; (6) Thompson was the only officer on the scene; (7) Thompson encountered a vehicle that held 4 men; (8) Thompson did not have an opportunity to search Salazar-Limon, his truck or his passengers; (9) Salazar-Limon wore a long shirt that hid his waistband; (10) Salazar-Limon actively resisted Thompson's attempts to detain him by pulling away and walking away from Thompson and not complying with his command to stop; (11) the entry wound of the bullet struck Salazar-Limon in his lower, right back and lodged in his L1 spine, suggesting that, at or near the time, Salazar-Limon was struck by the bullet, his body was turning towards the right and back in the direction of Thompson; and (12) Salazar-Limon pled guilty to resisting arrest and DWI.

Even viewing the summary-judgment evidence in a light most favorable to Salazar-Limon, the undisputed evidence in the record establishes that any reasonable officer facing the same circumstances and with the same information as Thompson would have fired their weapon.

The Fifth Circuit recently addressed the issue of qualified immunity in an officer involved shooting case in *Tolan v. Cotton,* 713 F.3d 299 (5th Cir. 2013).   The Court considered the following facts in granting summary judgment on qualified immunity:

> The undisputed summary-judgment evidence, however, shows: Officer Edwards and Sergeant Cotton believed they were dealing with a felony vehicle theft; multiple burglaries of vehicles had occurred in the area the night prior; the Tolan's porch was not well lit; Robbie Tolan, in spite of Officer Edwards' having drawn his pistol, disobeyed orders to remain prone while the Officers attempted to establish order and investigate the situation; and Robbie Tolan's moving to intervene in Sergeant Cotton's separating his mother was preceded by his shouting "get your fucking hands off my mom!"

*Tolan,* 713 F.3d at 306.   The court specifically noted that Robbie Tolan's refusal to obey a direct order to remain prone "could have reinforced an officer's reasonably believing Robbie Tolan to be a non-compliant and potentially threatening suspect."   *Id.* at p. 308.   Thompson was dealing with a suspect who physically resisted arrested while the two stood on a dimly lit overpass of a busy expressway; he was alone with Salazar-Limon and 3 other suspects, all of whom he had not searched; Salazar-Limon disobeyed Thompson's orders to stop and proceeded to walk in the direction of his truck which had not been searched either.   Contrary to Salazar-Limon's testimony, the medical evidence lead Allen, an experienced investigator, that the angle of which the bullet entered Salazar-Limon's body suggested that Salazar-Limon did not have his back completely to Thompson, but instead was angled to the right.   Based on all of the undisputed evidence in the record, Thompson acted as any reasonable officer would by using deadly force.

### 2.   Salazar-Limon's claim for unlawful arrest and seizure fails as a matter of law.

Salazar-Limon alleges that Thompson unlawfully seized and attempted to arrest Salazar-Limon when there was no warrant for Salazar-Limon's arrest nor did probable exist for his seizure/arrest.  (d/e 13, Amend. Compl., p. 11).   Specifically, he alleges that prior to his arrest,

Thompson did not perform standard field sobriety or Breathalyzer tests to determine if Salazar-Limon was intoxicated.   Salazar-Limon and his expert do not contest that Thompson had reasonable suspicion to detain Salazar-Limon for speeding.

a.    **Salazar-Limon's claim is barred by *Heck*.**

It is undisputed that Salazar-Limon pled guilty[1] to resisting arrest and DWI.  There is no evidence or allegation that the convictions were reversed or dismissed.

Salazar-Limon's allegations that there was no reasonable grounds for Thompson to believe that Salazar-Limon had committed an offense of DWI and that Thompson knew he was without probable cause to arrest Salazar-Limon  for DWI would directly call into question the validity of his conviction for DWI.

Under *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), a claim for damages under § 1983 bearing a relationship to a conviction or sentence that has not been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus is not cognizable.  A court must consider whether a judgment in favor of the plaintiff in a § 1983 suit would imply the invalidity of his conviction or sentence.  *Id.*  If such a judgment would invalidate the underlying criminal action, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  *Id.*

Salazar-Limon cannot make such a showing.  The Fifth Circuit's opinion in *Garrick v. Thibodeaux* is persuasive if not on point.  Garrick had been convicted on his plea of *nolo contendere* for disturbing the peace, resisting arrest, battery on a police officer and remaining after being forbidden.  *Garrick v. Thibodeaux,* 174 F.3d 198 (5th Cir. 1999)(not published).  The

---

[1]   Harris County criminal court records indicate that Salazar-Limon actually pled *no lo contendere* to resisting arrest and DWI and judgment was entered for both on August 15, 2012.  See court records for Harris County Criminal Court case  numbers 177351601010-2 and 171665201010-2

Fifth Circuit affirmed the district court's ruling in favor of the defendants on a summary judgment motion in that Garrick's allegations against the defendants would call into question the validity of his convictions for resisting arrest and battery of a police officer and as such, his claims were barred by *Heck*. *Id.*

> **b.  Thompson is entitled to qualified immunity on the unlawful detention and unlawful arrest claim.**

Even if this Court does not find that Salazar-Limon's claim is barred by *Heck*, Thompson is entitled to qualified immunity.  When Thompson made an initial contact with Salazar-Limon he could smell a strong odor of alcohol.  Based on Thompson's training and experience, he made a decision to perform a DWI investigation.  Plaintiffs' expert opines that Thompson was authorized to detain Salazar-Limon to perform a DWI investigation based on the information available to him at the time.  Indeed, Salazar-Limon pled guilty to DWI.  As such, Plaintiffs' argument that Thompson unlawfully seized Salazar-Limon is to no avail.

Plaintiffs' claim that Thompson unlawfully arrested Salazar-Limon also fails. The undisputed evidence in the record is that at the time Thompson was attempting to handcuff Salazar-Limon, Thompson has no intention of arresting him.  It is also undisputed that Salazar-Limon resisted Thompson's attempt to detain him and that Thompson never had the opportunity to perform the field sobriety test to establish probable cause to arrest Salazar-Limon.  As such, there is no violation of Salazar-Limon's constitutional rights based on an unlawful arrest.

> **3.  Salazar-Limon's Fourteenth Amendment Due Process claim fails as a matter of law.**

Plaintiffs' due process claim is based solely on his allegations that Thompson intentionally shot and paralyzed Salazar-Limon, who was unarmed and walking away from

Thompson.  (d/e 13, Amend. Compl., pp. 12-13),  Specifically, Plaintiffs allege that Thompson's actions deprived Salazar-Limon of the use of his lower body without due process of law.

The U.S. Supreme Court has held that a citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of his person are properly analyzed under the Fourth Amendment objective reasonableness standard rather than under a substantive due process standard.  *Graham,* 490 U.S. at 395.  As such, Plaintiffs' due process claim should be dismissed as a matter of law.

### 4.   Plaintiffs' claim for loss of familial society, companionship and association under 42 U.S.C. § 1983 fails as a matter of law.

Plaintiffs Susana, Edgar and Mark seek to recover for loss of familial society, companionship and association arising from Plaintiff Salazar-Limon's purported injuries and damage which form the basis of this lawsuit.  (d/e 13, Amend. Compl. p. 14).  To state a claim for deprivation of familial association under §1983, a plaintiff must show that the defendant intended to interfere with a particular relationship protected by the freedom of intimate association.  *Molette v. City of Alexandria,* C.A. No. 040501A, 2005 WL 2445432, *5 (W.D. La. Sept. 30, 2005)(citing *Trujillo v. Board of County Com'rs,* 768 F.2d 1186 (10th Cir. 1985)).  Adopting the same analysis as the *Truijillo* Court, the *Molette* Court held that the Plaintiffs did not allege that he defendants intentionally deprived them of their right to familial association and as such, the court dismissed this claim against the Defendants.

In the present case, the Plaintiffs likewise did not allege nor can they put forth any evidence that on the night in question, Thompson intended to interfere with their right to familial association with Salazar-Limon.  To the contrary, the only evidence in the record establishes that Thompson fired his weapon at Salazar-Limon when he was in fear of his life.  For those reasons, this claim brought by Susana, Edgar and Mark should be dismissed as a matter of law.

**B.**     **Vashaw, Sweatt and McClelland are entitled to qualified immunity as a matter of law for Salazar-Limon's supervisory liability claims under 42 U.S.C. § 1983.**

Plaintiffs allege that Defendants Vashaw, Sweatt and McClelland, in their individual capacities, were Thompson's supervisors at all times relevant to this lawsuit and that Thompson's acts deprived Salazar-Limon of the rights described in his Amended Complaint. (d/e 13, Am. Compl., p. 14).   Specifically, Plaintiffs allege that (1) Vashaw, Sweatt, and McClelland directed Thompson in the acts that deprived Salazar-Limon of said rights; (2) Vashaw, Sweatt and McClelland set in motion a series of acts by Thompson and other subordinates that they knew or reasonably should have known would cause the subordinates to deprive Salazar-Limon of said rights; (3) Vashaw, Sweatt and McClelland knew or reasonably should have known that Officer Thompson was engaging in these acts and that his conduct would deprive Salazar-Limon of said rights; and (4) Vashaw,  Sweatt, and McClelland failed to act to prevent Thompson from engaging in such conduct.   *Id.* at pp. 14-15.   Furthermore, Salazar-Limon alleges that the failures of Vashaw, Sweatt and McClelland to train, supervise, and/or discipline other HPD officers created an atmosphere of invincibility in violation of official Houston Police Department policies and procedures.   In support of his allegations, Salazar-Limon points to general statistics regarding civilians wounded or killed by HPD officers between 2006 and 2013 and specifically identifies by name 44 other cases involving civilians wounded or killed by HPD officers between 2006 and 2013.

As an initial matter, supervisory officials cannot be held liable for the actions of subordinates on a theory of vicarious or *respondeat superior* liability under § 1983.  *Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375, 381 (5th Cir. 2005).  Instead, a plaintiff must show that the supervisor's conduct denied the plaintiff his constitutional rights.  *Id.* In a failure to train or supervise case, the plaintiff must show that (1) the supervisor either failed

to supervise or train the subordinate; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.  *Id.*

Deliberate indifference is a stringent standard of fault which requires proof that a municipal official disregarded a known or obvious consequence of his action.  *Estate of Davis,* 406 F.3d at 381-82.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *Id.* Inept, erroneous, ineffective or negligent actions or decision by officials do not amount to deliberate indifference and do not divest officials of qualified immunity.  *Id.* (quoting *Alton v. Texas A&M Univ.,* 168 F.3d 196, 201 (5th Cir. 1999).

To prove deliberate indifference, the plaintiff must demonstrate a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation.  *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005).  Prior violations cannot be for any and all bad acts but rather must point to the specific violation in question.  *Estate of Davis,* 406 F.3d at 383.  Specifically, the official must fail to control an officer's known propensity for the improper use of force.  *Roberts,* 397 F.3d at 292.

At the time of the incident, Thompson was the only police officer on the scene.  As such, there is no evidence that Vashaw, McClelland, or Sweatt were present to direct Thompson's actions that are issue in this lawsuit.  Additionally, there is no evidence in the record to support that Vashaw, Sweatt, or McClelland were aware of facts from which an inference could be drawn that Thompson posed a substantial risk of serious harm to the citizens of Houston.  Prior to Thompson's interaction with Salazar-Limon, Thompson had only been involved in two other

shootings – both involving dogs.  There are no other complaints of excessive force or unlawful use of force by citizens against Thompson.

Plaintiffs also generally allege that these three Defendants failed to supervise, train or discipline other HPD officers under their command and that these failures led to an atmosphere of invincibility.  Plaintiffs have not and cannot identify any other HPD officers who engaged in similar conduct that was found to have violated a citizen's constitutional rights.  Without competent admissible evidence, Plaintiffs claims fail.

**C.    Salazar-Limon cannot establish that the City of Houston is liable under 42 U.S.C. § 1983.**

As a matter of law, a municipality is not liable under Section 1983 based on the theory of *respondeat superior*.  *Peterson v. City of Fort Worth, Tx.,* 588 F.3d. 838, 847 (5th Cir. 2009)(citing *Monell v. Dep't. of Soc. Servs. v. New York,*436 U.S. 658, 694 (1978)).  "When the claim is one of excessive force, the key to recovering against a municipality under § 1983 is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom.  *Holland v. City of Houston,* 41 F.Supp.2d 678, 697 (S.D. Tex. Jan. 7, 1999). If a plaintiff alleges or attempts to prove that a custom for which a municipality is liable is based on the actions of the municipality's employees, the plaintiff must show that those actions occurred for so long or so frequently that the course of conduct warrants attributing knowledge to the governing body that the conduct is an expected, accepted practice of the municipality's employees.  *Holland,* 41 F.Supp.2d at 698 (quoting *Webster v. City of Houston,* 735 F.2d 838-842 (5th Cir. 1984).  Random acts or isolated incidents are not sufficient to show the existence of a custom or policy.  *Id.*  A plaintiff must show that a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.  *Id.*

Finally, a plaintiff must show that there exists a direct causal link between a municipal or custom and the alleged constitutional deprivation.  *Id.*  Specifically, the government policy or custom was the proximate cause of the injuries sustained.  *Id.*

Failure to supervise.  For a municipality to be liable for failure to supervise under Section 1983, a plaintiff has to present evidence that it was obvious that "the highly predictable consequence" of not supervising its officers would lead to the violations of constitutional rights of citizens.  *Peterson,* 588 F.3d at 850.  Plaintiffs cannot point to any admissible summary judgment evidence that a highly predictable consequence of not supervising its officers, like Thompson, would lead to officers shooting citizens similar to that which occurred in this case.

Failure to train.  To establish a claim of failure to train under Section 1983, a plaintiff must show that the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011)(citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).  Deliberate indifference can only be established by proof that a municipal actor disregarded a known or obvious consequence of his action.  *Connick,* 131 S.Ct. at 1360.  City policymakers may be deemed deliberately indifferent if the policymakers choose to retain a training program that they are on actual or constructive notice that a particular omission in that program causes city employees to violate citizens' constitutional rights.  *Id.* "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.*  "There is no *de facto* final policymaking authority."  *Peterson*, 588 F.3d at 847-48 (citing *Jett v. Dallas I.S.D.*, 491 U.S. 701, 737 (1989)).  Chief Harold Hurtt is the only final policymaking authority in the Houston Police Department.

In the context of a failure to train or supervise allegation there usually requires a pattern of similar incidents in which citizens were injured.  *Estate of Davis,* 406 F.3d at 383.  A single incident is rarely sufficient evidence for liability.  *Id.*  "Prior incidents cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."  *Id.*

Plaintiffs allege that Houston both inadequately trained and/or failed to train its officers in response to repeated violations of HPD policies and procedures.  As an initial matter, Plaintiff cannot point to any admissible summary judgment evidence to support this conclusory, unsubstantiated claim.  Moreover, the undisputed evidence in the record establishes that HPD's training regimen meets if not exceeds what is mandated by the State licensing board.

Use of force is repeatedly addressed in both the cadet academy class and as a part of the 40-hour inservice training (20 hours above what is required by the State).  While in the academy, cadets are taught the courses, including courses on use of force, which are mandated by TCLEOSE/TCOLE.  Just prior to graduating from the academy, cadets go through seven different phases of field problems to prepare them for their work as police officers.  (Bratton, 29-32).  But that is not all.  Defendants' expert, Terry Bratton, detailed inservice classes taken by Thompson, which support Defendants' facts that officers continue to receive training in use of force long after they graduate from the academy.  There is no evidence in the record that officers, like Thompson, did not receive adequate training on use of force.

The analysis does not stop there.  Plaintiffs cannot put forth any evidence that the policymaker for HPD, the Chief of Police, chose to retain a training program that he is on actual or constructive notice that a particular omission in that program causes his officers to violate citizens' constitutional rights similar to what happened in this case.  Plaintiffs' expert attempts to point to 14 out of 670 cases involving a Houston police officer discharging his weapon as

evidence of a problem in HPD's training program.  However, Plaintiffs and their expert cannot show how these cases are similar to the present case to put the Chief of notice that his training program was deficient.  Furthermore, the Fifth Circuit has held that a small number of incidents in one of the nation's largest cities and police forces cannot support a pattern of illegality to support a failure to train claim.  See *Pineda v. City of Houston,* 291 F.3d 325, 329 (5th Cir. 2002)(holding that eleven incidents each offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces.).  Finally, Plaintiffs' cannot show that this unsubstantiated failure to train was the proximate cause of Salazar-Limon's damages.  For this reason, Plaintiffs' failure to train claim falls short.

<u>Ratification</u>.  A successful ratification claim requires a city policymaker to approve a subordinate's decision and the unconstitutional basis for it.  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988).  The theory of ratification has been limited to extreme actions such as obvious violations of clearly established law.  *Guidry v. City of Houston,* C.A. H-11-1589, 2011 WL 211114, at *3 (S.D. Tex. Jan. 17, 2013)(citing *World Wide Street Preachers Fellowship v. Town of Columbia,* 591 F.3d 747, 755 (5th Cir. 2009)).  Unless a subordinate's actions are sufficiently extreme, such as an obvious violation of clearly established law, a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom.  *World Wide Street Preachers Fellowship,* 591 F.3d at 755.

Similar to that of Plaintiffs' failure to supervise claim, there is no evidence that the Chief of Police ratified Thompson's conduct or the conduct of other officers who purportedly engaged in similar violations of clearly established law to establish an official policy or custom.  Without more than conclusory allegations, Plaintiffs cannot withstand a motion for summary judgment.

<u>Other claims</u>.  Plaintiffs also allege that Houston failed to effectively discipline or train its officers in response to repeated violations of HPD policies and procedures; failed to adequately perform a background investigation into its employees; failed to adequately investigate any and all prior allegations against its employees; Houston failed to establish adequate policies pertaining to allegations made against its employees.  (d/e 13, Amend. Compl., pp. 20-23).  Plaintiffs' raft of alleged failures on the part of Houston do not amount to anything more than conclusory allegations insufficient to withstand a motion for summary judgment. Plaintiffs cannot point to a municipal custom or policy which was the proximate cause of Plaintiffs' injuries.

**D.      Salazar-Limon cannot establish a conspiracy claim under 42. U.S.C. § 1985.**

Salazar-Limon alleges that Defendants Thompson, Vashaw, Sweatt, and McClelland, in their individual capacities conspired for the purpose of depriving, either directly or indirectly, Salazar-Limon of the equal protection of the laws.  (d/e 13, Am. Compl., p. 23)  Specifically, the conspiracy alleged involves a particular course of action by the individual Defendants against minority citizens in the City of Houston.  *Id.*  Because the Defendants are all COH employees and the City of Houston is a single legal entity, Salazar-Limon's claims fail as a matter of law.

To establish a claim under 42 U.S.C. § 1985, Salazar-Limon must establish (1) a conspiracy of two or more persons; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.  *Mays v. TSI Staffing, Inc.*, 56 F.Supp. 2d 738 (E.D. Tex – Jun. 15, 1999)(citing *Deubert v. Gulf Federal Sav. Bank,* 820 F.2d 754, 757 (5th Cit. 1987)).  Additionally, Salazar-Limon must establish that the conspiracy was motivated by class-based animus.  *Id.* (citing

*Hilliard v. Ferguson,* 30 F.3d 649, 653 (5th Cir. 1994)). As an initial matter, Salazar-Limon cannot put forth any competent and admissible evidence to establish a § 1985 conspiracy claim. Regardless, his claim fails as a matter of law because it is undisputed that Thompson, Vashaw, Sweatt and McClelland are all employees of the City of Houston and that the City of Houston is a single legal entity. As a matter of law, City of Houston employees cannot conspire among themselves. *Swilley v. City of Houston,* 457 Appx. 400, 404 (5th Cir. 2012)(citing *Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir. 1998)). For these reasons, Plaintiff's conspiracy claim against Thompson, Vashaw, Sweatt and McClelland should be dismissed as a matter of law.

**E.     The state law claims against Thompson, Vashaw, Sweatt and McClelland should be dismissed pursuant to § 101.106(f) of the Texas Tort Claims Act.**

Plaintiffs sued Thompson "in his official capacity only, for his actions as a police officer within the course and scope of his employment with the Houston Police Department." (d/e 13, Amend. Compl., p. 24). Plaintiffs allege that Thompson was "negligent and/or grossly negligent in pointing a loaded weapon at an unarmed citizen and discharging his firearm at Salazar-Limon, resulting in serious bodily injury from the bullet." *Id.* Plaintiffs also sued Vashaw, Sweatt and McClelland in their official capacities[2]. However, there are no claims specifically addressed at them. Instead, Plaintiffs allege that they brought the cause of action against Defendant City of Houston and Houston Police Department.

A suit against a government employee in his official capacity is in all respects a suit against the government entity. *University of Texas Medical Branch at Galveston v. Hohman,* 6 S.W.3d 767, 777 (Tex. App. - Houston [1[st] Dist.] 1999). If a suit is filed against an employee of a governmental unit based on conduct within the scope of that employee's employment and the

---

[2]    Plaintiffs' caption for the Texas Tort Claim Act: Negligent Supervision states that it is against "Defendant officers, in their Official Capacities, and City of Houston.

Plaintiff could have brought against the government entity, then, on the employee's motion, the suit against the employee shall be dismissed.  Tex. Civ. Prac. & Rem. Code Ann. §101.106(f).  Because Plaintiffs have clearly sued Thompson, Vashaw, Sweatt and McClelland in their official capacities based on conduct in the course and scope of their employment and they could have and did bring suit against the Defendant City of Houston[3], their claims against Thompson, Vashaw, Sweatt and McClelland should be dismissed.

**F.      Plaintiffs' negligence claims against the City are barred.**

Plaintiffs allege that the City of Houston was negligent in implementing its use of force policies and procedures by failing to properly train and supervise its police officers, including Thompson.  (d/e 13, Amend. Compl., pp. 24-25).   Plaintiffs also allege that immunity for Houston has been waived.  *Id.*  This is not so.  Houston did not waive its immunity and, as such, Plaintiffs' claims against Houston are barred.

Under the doctrine of sovereign immunity, a governmental entity cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving the immunity.  *Holland,* 41 F.Supp. 2d at 710.  Immunity can only be waived through the use of clear and unambiguous language.  *Id.*  In the absence of such a waiver, the governmental entity is entitled to sovereign immunity with respect to a plaintiff's claims.  *Id.*

The Texas Tort Claims Act (TTCA) waives immunity in certain limited circumstances.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021.   "In order to hold the City liable under the TTCA, the plaintiff's injuries must have been proximately caused by the operation or use of a motor-driven vehicle or motor-driven equipment or by a condition or use of tangible real or

---

[3]  Plaintiffs did not name HPD as a defendant in the Amended Complaint.  Moreover, HPD is not an entity capable of being sued.  *See Darby v. Pasadena Police Department,* 939 F.2d 311, 313 (5th Cir. 1991)(holding that administrative departments of a city are not capable of being sued); *Morgan v. Nueces County,* No. C-08-358, 2009 WL 197558, * 3 (S.D.Tx.  Jan. 27, 2009)(holding that the police department "does not enjoy a separate legal existence from the municipality).

personal property." *Holland v. City of Houston*, 41 F.Supp. 2d 678, 710-11 (S.D.Tex. Jan. 7, 1999). Tangible property has been defined as property that is capable of being handled, touched, or seen. *Id.*

Plaintiffs' allege that Houston failed to train and supervise officers, including Thompson, in the use of force. The failure to train and supervise clearly do not involve motor-driven vehicles/equipment or tangible property. As such, Houston cannot be held liable and is entitled to sovereign immunity on Plaintiffs' failure to train and supervise claims. *See Holland,* 41 F.Supp. 2d at 712 (holding that the plaintiff's claims against the city for improper training and faulty police procedure are barred by sovereign immunity because no tangible property is involved).

To the extent Plaintiffs attempt to set forth a claim against Houston for Thompson's negligence, that claim is also barred. Plaintiffs sued Thompson in his official capacity alleging that he was negligent and/or grossly negligent in pointing a loaded weapon at an unarmed citizen and discharging and seriously injuring Salazar-Limon. (d/e 13, Amend. Compl., p. 24). Plaintiffs' allege that immunity has been waived because the claim arises from personal injury caused by the use of tangible property – a firearm and bullet. *Id.* Plaintiffs' clever attempt to couch this as a negligence action is to no avail. Plaintiffs have continuously alleged that Thompson shot Salazar-Limon in the right side of his lower back as Salazar-Limon was walking away and that Thompson has no reason to suspect that Salazar-Limon was committing or had committed a violent crime nor did Salazar-Limon pose a threat to Thompson or any other person. (d/e 13, Amend. Compl., pp. 5-6). Under this version of the alleged facts, there is no suggestion that Thompson's conduct was just negligent. It is in fact the opposite. Plaintiffs actually are raising a claim of wrongful assault and battery. *See Holland,* 41 F.Supp. 2d at 713(quoting

33

*Alaniz v. United States,* 257 F.2d 108, 110-11(10th Cir. 1958)) ("While it was pleaded in the complaint that the [defendant] negligently and without exercising reasonably prudent care shot and killed the deceased the cause of action which [the plaintiff] sought to plead was one for wrongful assault and battery resulting in the death of the deceased."). The evidence in the record is that Thompson fired his weapon because he was in fear for his life. There is no allegation or evidence in the record to suggest that Thompson's shooting of Salazar-Limon was negligence. Plaintiffs' essentially have alleged that Thompson committed an intentional tort.

Section 101.057 of TTCA shields municipalities from suits arising out of intentional torts committed by governmental employees. TEX. CIV. PRAC. & REM. CODE. ANN. § 101.057. Because Thompson's actions can only be categorized as an intentional tort, Houston cannot be held liable for Thompson's actions.

**G.    Plaintiffs cannot recover for loss of consortium under state law because all state law claims are barred.**

Plaintiffs Susana, Edgar and Mark seek to recover for loss of consortium under state law. As set forth above, all state law claims brought against the Defendants in this lawsuit are barred under the Texas Tort Claims Act. As such, Plaintiffs do not have right of recovery for loss of consortium under state law. For these reasons, Plaintiffs' loss of consortium claim should be dismissed.

Discovery and motion practice in this present action have been bifurcated so that this present motion only addresses the Defendants' assertion of qualified immunity. As such discovery has not yet been conducted on this issue. To the extent that the Court finds that Plaintiffs' have failed to state a claim for which relief can be granted and that the Defendants are entitled to the immunities they have raised, Plaintiffs claims seeking damages should likewise be dismissed along with Plaintiffs state law claims against the Defendants. Defendants reserve the

right to address damages and the Plaintiffs' rights to recovery of said damages at a later time if so required.

**H.    Damages**

**1.    Plaintiffs' claim for exemplary damages against the City of Houston is barred.**

Plaintiffs seek exemplary damages for Defendants' alleged conduct and requests this Court to "punish Defendants for engaging in unlawful practices."  (d/e 13, Amend. Compl., p. 27).  Section 101.024 of the Texas Tort Claims Act does not waive immunity from exemplary damages.  Tex. Civ. Prac. & Rem. Code Ann. § 101.024; *see also Cronen v. Ray,* Nos. 14-05-00788-cv, 14-05-00789-CV, 2006 WL 2547989 at *4 (Tex. App. Hous. (14th Dist.)); *City of LaPorte v. Barfield,* 898 S.W.2d 299 (Tex. 1995).   Thus, Plaintiff's claim for exemplary damages is barred.

**2.    Plaintiffs are not entitled to the damages they seek.**

Discovery and motion practice in this present action have been bifurcated so that this present motion only addresses the Defendants' assertion of qualified immunity.   As such discovery has not yet been conducted on this issue.   To the extent that the Court finds that Plaintiffs' have failed to state a claim for which relief can be granted and that the Defendants are entitled to the immunities they have raised, Plaintiffs claims seeking damages should likewise be dismissed along with Plaintiffs § 1983 and state law claims against the Defendants.   Defendants reserve the right to address damages and the Plaintiffs' rights to recovery of said damages at a later time if so required.

**VI.    CONCLUSION**

For the reasons state above, there is no genuine issue as to any material fact in any of the claims brought by the Plaintiffs.   All officers and the City have established their qualified

immunity defense.  Plaintiffs cannot present evidence to this Court that support their claims and defeat the Defendants' assertion of qualified immunity.  As such, Defendants motion for summary judgment should be granted on all claims.

WHEREFORE, Defendants respectfully request this Court to grant their motion for summary judgment, dismiss all of Plaintiffs claim and grant them any additional relief the Court deems appropriate.

Respectfully submitted,


DAVID M. FELDMAN
City Attorney

LYNETTE FONS
First Assistant City Attorney

DONALD FLEMING
Senior Assistant City Attorney

/s/ DEIDRA A. NORRIS
DEIDRA A. NORRIS
Assistant City Attorney
FBN: 1338580
TBN: 24080648
Phone No. 832-393-6476
Fax No. 832-393-6259
deidra.norris@houstontx.gov

SUZANNE R. CHAUVIN
Senior Assistant City Attorney
FBN: 14512
TBN: 04160600
Phone No. 832-393-6219
suzanne.chauvin@houstontx.gov

City Attorney's Office
Labor, Employment and Civil Rights Section
P.O. Box 368
Houston, TX 77001-0368
Fax No. 832-393-6259

ATTORNEYS FOR DEFENDANTS THOMPSON
READY, HERRERA, VASHAW, SWEATT,
BIGGER, MCCLELLAND and CITY OF
HOUSTON

## CERTIFICATE OF SERVICE

I, Deidra A. Norris, certify that on this, the **18th day of April, 2014**, a copy of the foregoing document was filed electronically using the CM/ECF system, which will cause all parties by their respective counsel of record to be served by electronic transmission:

cc:    Mehran "Mike" Talabi, and
       Sean Palavan
       Talabi & Associates, P.C.
       6420 Richmond Ave., Suite 600
       Houston, Texas 77057