UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICARDO SALAZAR-LIMON,<br>Individually and as Next Friend of<br>EDGAR FRANCISCO SALAZAR AND<br>SUSANA RENTERIA, Individually and<br>as Next Friend of MARK BRAYAN<br>SALGADO<br>Plaintiffs, | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |
| v. | § <br> § | Civil Action No. 4:12-cv-03392 |
| CHRIS C. THOMPSON, D. W. READY,<br>J. G. HERRERA, T. VASHAW, J. B.<br>SWEATT, C. BIGGER and CHARLES<br>A. MCCLELLAND, JR., Individually<br>and in their Official Capacities, CITY OF<br>HOUSTON, and JOHN DOES #2-5<br>Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § | |

## PLAINTIFFS' RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE LEE H. ROSENTHAL:

**NOW COME** RICARDO SALAZAR-LIMON, Individually and as Next Friend of

EDGAR FRANCISCO SALAZAR AND SUSANA RENTERIA, Individually and as Next

Friend of MARK BRAYAN SALGADO ("Plaintiffs") and file their Response to CHRIS C.

THOMPSON, T. VASHAW, J. B. SWEATT and CHARLES A. MCCLELLAND, JR.,

Individually and in their Official Capacities, and CITY OF HOUSTON'S ("Defendants") Motion

for Summary Judgment, and in support thereof respectfully show the Court the following:

## TABLE OF CONTENTS

Table of Contents.................................................................................................2

Index of Authorities ...........................................................................................4

List of Exhibits ...................................................................................................7

Statement of the Issues.......................................................................................1

Summary Judgment Standard.............................................................................1

Summary of the Argument .................................................................................2

Detailed Factual Background .............................................................................3

Argument and Authorities ..................................................................................5

    A.  OFFICER THOMPSON IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HIS SHOOTING OF SALAZAR ...................................................................................5

        1.  Thompson Violated Salazar's Fourth Amendment Constitutional Right to Be Free From Unreasonable Seizure ...................................................................6

        2.  Thompson's Use of Force to Apprehend Salazar Was Clearly Excessive to the Need and Objectively Unreasonable When Salazar Posed No Immediate Threat ...................7

        3.  In October 2010, It Was Clearly Established That a Police Officer Violates Fourth Amendment Rights by Shooting a Suspect Who is Unarmed and Poses No Immediate Threat of Harm ..........................................................................14

        4.  By Prevailing on His Excessive Force Claim, Plaintiff Will Not Invalidate His Conviction for Resisting Arrest; Regardless of Whether the Initial Detention/Arrest Was Justified, the Subsequent Shooting Was Not .....................................15

    B.  HPD IS LIABLE FOR A FACIALLY DEFICIENT USE OF FORCE POLICY ..........18

        1.  HPD's Use of Force Policy Violated Salazar's Constitutional Rights Because It Allows for Deadly Force Even When There Was No Immediate Threat.....................18

        2.  Deliberate Indifference ...................................................................21

        3.  HPD's Written Use of Force Policy Was a Moving Force Behind the Shooting of Salazar ...............................................................................22

    C.  HPD IS LIABLE FOR THE FAILURE TO TRAIN ITS OFFICERS IN WHEN TO USE DEADLY FORCE.........................................................................23

        1.  HPD Failed to Provide Adequate Situational and Decision-Based Firearm and Deadly Force Training..................................................................23

        2.  HPD Was Deliberately Indifferent By Ignoring the Need for Additional Training. 29

3.   The Inadequate Policy Caused Salazar's Injuries ................................................... 40

D.  HPD IS LIABLE FOR THE FAILURE TO SUPERVISE AND DISCIPLINE ITS OFFICERS DESPITE A PATTERN OF SHOOTINGS OF UNARMED CITIZENS ......... 42

1.   HPD's Investigations of Officer Involved Shootings Were Inadequate and Consistently Found Shootings of Unarmed Suspect to be Justified ............................. 42

2.   The Lack of Discipline for Such Shootings Provided an Aura of Immunity for HPD Officers, In Deliberate Indifference to the Rights of Citizens ...................................... 46

3.   Moving Force/Causation ........................................................................................ 47

E.  HPD RATIFIED THE UNCONSTITUTIONAL CONDUCT OF OFFICER THOMPSON ......................................................................................................................... 47

F.   PLAINTIFFS ARE ENTITLED TO EXEMPLARY DAMAGES FROM THE INDIVIDUAL DEFENDANTS FOR THEIR SECTION 1983 CLAIMS ............................ 49

Conclusion and Prayer ................................................................................................................ 49

### INDEX OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Abraham v, Raso*, 183 F.3d 279 (3rd Cir. 1999) ................................................................... 6, 10

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) ................................................................... 2

*Allen v. Muskogee, Okla.*, 119 F.3d 837, 845 (10th Cir. 1997) ............................................... 28

*Anderson v. Creighton*, 483 U.S. 635 (1987) .......................................................................... 3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ................................................ 2, 3, 9

*Baker v. Putnal*, 75 F. 3d 190, 198 (5th Cir. 1996) ................................................................ 11

*Bazan ex rel. Bazan v. Hidalgo County*, 246 F. 3d 481, 490 (5th Cir. 2001) ........... 4, 6, 10, 11, 13

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997) ................... 21, 27, 29

*Brosseau v. Haugen*, 543 U.S. 194 (2004) .............................................................................. 3

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ......................................................... *passim*

*Clayton v. Columbia Cas. Co.*, 547 Fed. Appx. 645 (5th Cir. 2013) ..................................... 7, 14

*Connick v. Thompson*, 131 S.Ct. 1350 (2011) ..................................................................... 31, 32

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005) ........ 35

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) ...................................................... 43

*Flores v. City of Palacios*, 381 F. 3d 391, 399 (5th Cir. 2004) ............................................. 8, 15

*Graham v. Connor*, 490 U.S. 386 (1989) ......................................................................... *passim*

*Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) ...................................... 31

*Hare v. City of Corinth, Miss.,* 135 F.3d 320 (5th Cir. 1998) ................................................. 14

*Hobart v. City of Stafford*, 784 F.Supp.2d 732 (S.D. Tex. 2011) ........................................... 23

*Holland ex rel. Holland v. City of Houston*, 41 F. Supp. 2d 678 (S.D. Tex. 1999) ................... 20

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................................................ 5, 6, 15

*Kinney v. Weaver,* 367 F.3d 337 (5th Cir. 2004) .................................................................... 14

*Lytle v. Bexar County, Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) ............................................... 8, 20

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157 (2d Cir. 1999) ................ ix

*Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009) ............................................... 43

*Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002) ............................................ *passim*

*Popow v. City of Margate*, 476 F.Supp. 1237 (D.N.J. 1979) ......................................................... 32

*Ramirez v. Martinez,* 716 F.3d 369 (5th Cir. 2013) ...................................................................... 7

*Reyes v. Bridgewater*, 362 Fed.Appx. 403 (5th Cir. 2010) .................................................... *passim*

*Roberts v. City of Shreveport,* 397 F.3d 287 (5th Cir. 2005) .......................................................... 23

*Rockwell v. Brown,* 664 F. 3d 985, 993 (5th Cir. 2011) ............................................................... 8

*Rodriguez v. Avita,* 871 F.2d 552, 554–55 (5th Cir. 1989) ............................................................ 30

*Russo v. City of Cincinnati,* 953 F.2d 1036, 1046–47 (6th Cir. 1992) .......................................... 34

*Sanchez v. Fraley*, 376 Fed. Appx. 449 (5th Cir. 2010) ........................................................ *passim*

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) .............................................................................. 5, 6

*Smith v. Wade*, 461 U.S. 30 (1983) .................................................................................... 16, 49

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005) ................................................................. *13*

*Tennessee v. Garner*, 471 U.S. 1 (1985) ............................................................................. *passim*

*Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001) ................................................... 36, 37

*Tolan v. Cotton*, 713 F.3d 299, 301 (5th Cir. 2013) ............................................................ 11, 12

*Tolan v. Cotton*, No. 13-551, 572 U.S. ___, at *8 (May 5, 2014) ........................................ 11, 12

*Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010) ........................................................ 32

*Walker v. City of New York*, 974 F.2d 293, 298 (2nd Cir. 1992) .................................................. 32

*Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) ............................................. *passim*

*Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005) ...................................................... *passim*

*Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161 (5th Cir. 2010) ........................................... 23

*Zuchel v. City and County of Denver*, 997 F.2d 730 (10th Cir. 1993) .................................. 32, 41

**Statutes and Rules**                                                          **Page(s)**

Fed. R. Civ. P. 56(a) ........................................................................................... 1

42 U.S.C. § 1983 ...................................................................................... *passim*

City of Houston Code of Ordinances, Ch. 34 § 34-22................................. 16

### LIST OF EXHIBITS

Exhibit 1 – Deposition of Ricardo Salazar-Limon

Exhibit 2 – Deposition of Chris C. Thompson

Exhibit 3 – Deposition of John B. Sweatt

Exhibit 4 – Deposition of Terry A. Bratton

Exhibit 4a – Thompson certification records (Salazar-Limon 1245-1246)

Exhibit 5 – Deposition of John Lambert

Exhibit 6 – Deposition of Thomas A. Vashaw

Exhibit 7 – Deposition of Doyle E. Jackson

Exhibit 8 – Deposition of Timothy J. Allen

Exhibit 9 – Deposition of Mattie C. Provost

Exhibit 10 – Deposition of George T. Buenik

Exhibit 11 – Deposition of Keith A. Howse

Exhibit 12 – Ricardo Salzar-Limon's Mexican ID

Exhibit 13 – Ricardo Salazar-Limon's Ben Taub records

Exhibit 14 – Photographs of the shooting scene

Exhibit 15 – Subpoenaed records from Harris County District Attorney

Exhibit 16 – Supreme Court opinion in *Tolan v. Cotton*

Exhibit 17 – Photographs of Officer Thompson

Exhibit 18 – Excerpts from IAD case # 37927-2010 (Salazar-Limon 9-97, 228-266, 328-340, 597-649)

Exhibit 19 – HPD General Order 600-17 (Salazar-Limon 668-672)

Exhibit 20 – Strategic Response (Salazar-Limon 12267-12272)

Exhibit 21 – Field Training Checklist (Salazar-Limon 12152-12187)

Exhibit 22 – Response to Active Shooter (Salazar-Limon 12522-12528)

Exhibit 23 – 2008 NYPD RAND report (Salazar-Limon 13390-13402)

Exhibit 24 – HPD General Order 400-05 (Salazar-Limon 10347-10360)

Exhibit 25 – IAD investigations of prior shootings

Exhibit 26 – IAD Discharge of Firearms Log (2006-2013) (Salazar-Limon 1123-1241)

Exhibit 27 – Class I routing diagram (Salazar-Limon 741)

Exhibit 28 – Shooting Review Committee (Salazar-Limon 013317-013319, 013331-013337)

Exhibit 29 – SRC meeting notes (Salazar-Limon 13297)

Exhibit 30 – Expert Report of Roger Clark (Salazar-Limon 13473-13485)

Exhibit 31 – Thompson complaint history (Salazar-Limon 1534)

Exhibit 32 – HPD General Order 200-08 (Salazar-Limon 658-661)

Exhibit 33 – Corrective Action Manual (Salazar-Limon 696-699)

Exhibit 34 – Report and Affidavit of Keith A. Howse (with attachments)

## STATEMENT OF THE CASE

This is a civil rights case brought under 42 U.S.C. § 1983 *et seq.* and the Texas Tort Claims Act (TEX. CIV. PRAC. & REM. CODE, Chapter 101). The case was bifurcated as to qualified immunity and municipal liability, and it is not currently set for trial. The case now comes before this Honorable Court on Defendants' Motion for Summary Judgment as to qualified immunity and municipal liability. The issue of damages is not before the Court at this time.

## STATEMENT OF THE ISSUES

The issue before the Court is whether summary judgment should be granted to Defendants Thompson, Vashaw, Sweatt, McClelland and City of Houston on all of Plaintiffs' claims. Specifically including:

1. Whether there are genuine issues of material fact as to whether Thompson's shooting of Salazar was clearly excessive and objectively unreasonable in light of the clearly established law.

2. Whether there are genuine issues of material fact as to whether HPD's use of force policy was unconstitutional.

3. Whether there are genuine issues of material fact as to whether HPD was deliberately indifferent by failing to adequately train its officers in the use of deadly force.

4. Whether there are genuine issues of material fact as to whether HPD was deliberately indifferent by failing to adequately investigate and discipline officers who shot and killed or injured civilians.

5. Whether there are genuine issues of material fact as to whether HPD ratified the shooting by Thompson.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is a drastic device and, therefore, Defendant bears a heavy burden of demonstrating the absence of any triable issue of material fact. *See, e.g., Nationwide Life Ins. Co.*

1

*v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999). In making that determination, a court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The evidence of Plaintiffs, as the non-movants, is to be believed at the summary judgment stage. *See, e.g., Anderson*, 477 U.S. at 255.

## SUMMARY OF THE ARGUMENT

Officer Thompson is not entitled to qualified immunity on Salazar's excessive-force claim under 42 U.S. §1983. Thompson violated Salazar's Fourth Amendment constitutional right to be free from unreasonable seizure. Thompson's use of force to apprehend Salazar was clearly excessive to the need and objectively unreasonable because Salazar did not pose an immediate threat of death or bodily injury to Thompson or anyone else when Thompson shot him in the back during a traffic stop. In October 2010, the law was clearly established that a police officer violates the Fourth Amendment by shooting an unarmed suspect who poses no immediate threat to the officer or others. Salazar's excessive-force claim against Thompson is not barred under *Heck v. Humphrey* because his conviction for resisting arrest will not be invalidated; regardless of whether the initial detention was justified, the subsequent shooting was not.

HPD's current Use of Force policy is unconstitutional on its face because it misstates the legal standard regarding when the use of deadly force by law enforcement officers is permissible and authorizes officers to use deadly force in situations beyond those permitted by longstanding, clearly established federal law. Moreover, the policy is impermissibly vague and provides little guidance as to when deadly force is authorized under either the policy or federal law. The written Use of Force policy was a moving force behind Thompson's violation of Salazar's Fourth Amendment right to be free from unreasonable seizure.

2

The City of Houston is liable for the failure to train HPD officers when it is appropriate to use deadly force. HPD failed to provide adequate situational and decision-based firearm and deadly force training. By ignoring the clear need for additional training, HPD was deliberately indifference to the rights, safety and welfare of the public, including Salazar. HPD's inadequate training policies caused Salazar's injuries.

The City of Houston is further liable for the failure to supervise and discipline its officers despite a pattern of shootings involving unarmed citizens. HPD's investigations of officer involved shootings are inadequate and consistently find shootings of unarmed suspects to be justified. The lack of discipline for such shootings provides an aura of immunity to HPD officers, in deliberate indifference to the rights of citizens. The failure to supervise and discipline HPD officers was moving force behind Thompson's shooting of Salazar.

HPD ratified Thompson's unconstitutional conduct by finding the shooting to be justified notwithstanding the fact that the facts are analogous to the 2003 shooting of Eli Escobar, where HPD's Internal Affairs Division found the shooting to not be justified.

## DETAILED FACTUAL BACKGROUND

On the night of October 29, 2010, Plaintiff Ricardo Salazar-Limon ("Salazar") had finished his job for the day and met up with his friend, Rogelio, afterwards.[1] They later went to get some tacos and meet up with two of Rogelio's friends.[2] After visiting for a while and drinking some beer, the four left together and headed southbound on Highway 59, with Ricardo driving, to meet up with someone else.[3] Along the way, they passed Thompson, who was running lidar that night.[4] He noticed Plaintiff's vehicle speeding and activated his lights and

---

[1] Salazar Depo at 11:7-16, Ex. 1
[2] Salazar Depo at 12:6-18, Ex. 1
[3] Salazar Depo at 14:21-15:14, Ex. 1
[4] Thompson Depo at 87:23-88:11, Ex. 2

sirens to initiate a traffic stop on Plaintiff.[5] Once Plaintiff saw the police car lights and heard the siren, he safely changed lanes, crossed traffic, and pulled over to the right shoulder.[6] It took less than a minute for Plaintiff to pull over and stop, and the distance from when Thompson activated his lights and sirens until Plaintiff was stopped on the right shoulder was less than two miles and barely two exits on the freeway.[7] Plaintiff stopped his car safely and entirely within the right shoulder, and Thompson pulled in behind him.[8]

In response to a request by Thompson, Plaintiff cooperated and produced his Mexican identification and insurance for the truck.[9] Having positively identified Plaintiff at this point,[10] Thompson returned to his vehicle to run a search, which came back clear, indicating that Plaintiff had no open warrants or charges.[11] Thompson had previously run the vehicle, and it had also come back clear.[12] During this time, Plaintiff remained calm and in his vehicle.[13] He then followed Thompson's command to exit the truck and stand between the two vehicles.[14] As the two were facing each other, Thompson pulled out his handcuffs, told Plaintiff he was taking him to jail, and grabbed his right hand.[15] Frightened and confused, Plaintiff pulled his hand away and turned away from Thompson.[16] Plaintiff then walked along the passenger side towards the front of the truck.[17] At no time was there any struggle between the two, nor did they end up near the

---

[5] Thompson Depo at 93:9-94:4, Ex. 2
[6] Salazar Depo at 18:3-19:5, Ex. 1
[7] Thompson Depo at 94:7-95:21, Ex. 2
[8] Thompson Depo at 94:15-97:12, Ex. 2
[9] Thompson Depo at 98:23-100:8, Ex. 2; Salazar Depo at 19:22-20:21, Ex. 1
[10] The identification card had Plaintiff's name, address, and photograph.; Salazar ID, Ex. 12
[11] Thompson Depo at 100:9-11, Ex. 2; Bratton Depo at 38:4-16, Ex. 4
[12] Thompson Depo at 97:17-98:8, Ex. 2
[13] Thompson Depo at 100:22-101:14, Ex. 2
[14] Salazar Depo at 23:3-20, Ex. 1; Thompson Depo at 100:22-101:14, Ex. 2
[15] Salazar Depo at 25:14-26:5, Ex. 1
[16] Salazar Depo at 26:1-10, Ex. 1; Thompson Depo at 107:6-109:8, Ex. 2
[17] Salazar Depo at 26:11-25, Ex. 1; Thompson Depo at 113:1-9, Ex. 2

edge of the freeway.[18] During this time, Plaintiff never said anything or threatened Thompson.[19] At no time did the other passengers in the vehicle get out or otherwise threaten Thompson.[20]

As Plaintiff continued walking away, Thompson drew his weapon and pointed it at Plaintiff, giving a single command for Plaintiff to stop while almost simultaneously firing one shot into Plaintiff's back.[21] Salazar then took a few steps and collapsed on the roadway in front of the truck.[22] He was taken by ambulance to Ben Taub Hospital.[23]

<u>**ARGUMENT AND AUTHORITIES**</u>

### A.   OFFICER THOMPSON IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HIS SHOOTING OF SALAZAR

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury,... show the officer's conduct violated a [federal] right[.] *Saucier v. Katz*, 533 U.S. 194, 201 (2001). When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The inquiry into whether this right was violated requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *see Graham*, *supra*, at 396.

The second prong of the qualified-immunity analysis asks whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Freeman v. Gore*, 483 F.3d 404, 410-411 (5th Cir. 2007). "[T]he salient question... is whether the state of the law at the time of

---

[18] Salazar Depo at 26:14-27:10, Ex. 1
[19] Salazar Depo at 29:3-14, Ex. 1
[20] Thompson Depo at 137:7-14, Ex. 2
[21] Salazar Depo at 27:15-28:3; 29:15-24, Ex. 1; Thompson Depo at 114:21-115:13, Ex. 2
[22] Thompson Depo at 133:22-134:7, Ex. 2
[23] *See* Thompson Depo at 143:8-12, Ex. 2; Salazar Ben Taub records, Ex. 13

the incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.* at 741. In cases alleging unreasonable searches or seizures, the Supreme Court has instructed that courts should define the "clearly established" right at issue on the basis of the "specific context of the case." *Saucier*, *supra*, at 201; *see also Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987).

Under either prong, courts may not resolve genuine issues of fact in favor of the party seeking summary judgment. *See Brosseau v. Haugen*, 543 U.S. 194, 195 n. 2 (2004) (per curiam); *Saucier*, *supra*, at 201; *Hope*, *supra*, at 733, n. 1. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

At this stage, Salazar does not challenge whether Thompson had the right to lawfully detain him in order to conduct a DWI investigation.[24] Rather, the relevant inquiry is into the constitutionality of Thompson's *subsequent* decision to use deadly force to seize Salazar.

## 1. Thompson Violated Salazar's Fourth Amendment Constitutional Right to Be Free From Unreasonable Seizure

Thompson has admitted to intentionally using deadly force against Salazar by shooting him in the back as Salazar walked away after Thompson tried to handcuff him to investigate whether probable cause existed to arrest Salazar for driving while intoxicated.[25] This act was clearly a seizure, implicating Salazar's Fourth Amendment rights. *Graham*, 490 U.S. at 394; *Bazan ex rel. Bazan v. Hidalgo County*, 246 F. 3d 481, 490 (5th Cir. 2001) ("apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment") (quoting *Garner*, 471 U.S. at 7).

---

[24] It is, however, highly doubtful that Thompson had probable cause for a DWI arrest. TEX. PEN. CODE § 49.01 *et seq.* Nor could he lawfully arrest Plaintiff for speeding. TEX. TRANSP. CODE § 543.004; Howse report at 5, Ex. 34
[25] Salazar Depo at 26:1-25, Ex. 1; Thompson Depo at 107:6-109:8, Ex. 2

"For an excessive-force claim, a plaintiff clears the first prong of the qualified-immunity analysis at the summary-judgment stage by showing a genuine dispute of material fact that he sustained: '(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable'." *Clayton v. Columbia Cas. Co.*, 547 Fed. Appx. 645, 649 (5th Cir. 2013) (quoting *Ramirez v. Martinez,* 716 F.3d 369, 377 (5th Cir. 2013)).

It is undisputed that Salazar suffered an injury, to wit, a bullet wound which rendered him permanently paralyzed, as a result of Thompson's intentional use of deadly force against him.[26] Accordingly, the court need only consider whether the summary judgment evidence creates a genuine issue of fact as to whether Thompson's use of deadly force was appropriate to the need, and thus, objectively reasonable, or clearly excessive and objectively unreasonable under the circumstances.

## 2. Thompson's Use of Force to Apprehend Salazar Was Clearly Excessive to the Need and Objectively Unreasonable When Salazar Posed No Immediate Threat

Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *See Terry* v. *Ohio,* 392 U. S., at 22-27. Whether Thompson's use of deadly force was reasonable or clearly excessive under the Fourth Amendment is determined from the perspective of a reasonable officer on the scene, rather than with "the 20/20 vision of hindsight." *Bush v. Strain,* 513 F.3d 492, 502 (5th Cir. 2008) (internal quotation marks omitted). To "gaug[e] the objective reasonableness of the force used by a law enforcement officer, [the court] must balance the amount of force used against the need for force." *Ikerd v. Blair,* 101 F.3d 430, 434 (5th Cir. 1996) (citing *Spann v. Rainey,* 987 F.2d 1110, 1115 (5th Cir. 1993)). However, when an officer uses deadly force, the "objective reasonableness" balancing test is constrained.

---

[26] Thompson Depo at 133:24-136:2, Ex. 2; Jackson Depo at 69:20-70:8, Ex. 7; Salazar Ben Taub records at 16 and 22, Ex. 13

*Flores v. City of Palacios*, 381 F. 3d 391, 399 (5th Cir. 2004). It is objectively unreasonable to use deadly force "unless it is necessary to prevent [a suspect's escape] and the officer has probable cause to believe that the suspect poses an immediate, significant threat of death or serious physical injury to the officer or others. *Garner,* 471 U.S. at 3.

The Supreme Court has required courts to be deferential to the choices made by police officers in high-risk situations. *See Graham,* 490 U.S. at 397. That deference, however, cannot extend so far as to ignore an officer's violation of the core, established rule that deadly force may not be used "[w]here the suspect poses no immediate threat to the officer and no threat to others." *Garner,* 471 U.S. at 11. It violates the Fourth Amendment to use deadly force absent such an immediate threat. *Reyes v. Bridgewater*, 362 Fed.Appx. 403, 407 (5th Cir. 2010).

It is also true that the United States Supreme Court has held that courts must look at the "totality of the circumstances" when assessing the reasonableness of a police officer's use of force. *Graham,* 490 U.S. at 396 (citing *Garner,* 471 U.S. at 8–9). The Fifth Circuit, however, has narrowed that test, holding that "[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Rockwell v. Brown*, 664 F. 3d 985, 993 (5th Cir. 2011) (quoting *Bazan,* 246 F.3d at 493) (emphasis in original). The Court in *Rockwell* emphasized that "**[w]e need not look at any other moment in time.**" *Id.* (emphasis added).

In other words, just because deadly force may be appropriate at one point in time does not give an officer *carte blanche* to use deadly force at any time thereafter.[27] This principle was illustrated by the Fifth Circuit in *Lytle v. Bexar County, Tex.*:

> As a preliminary matter, by the time the Taurus was three or four houses away, a jury could conclude that any immediate threat to O'Donnell had ceased. To be sure, the Taurus might have posed an immediate and significant threat of harm to O'Donnell when it was backing up toward him. **But an exercise of force that is**

---

[27] Howse Depo at 113:2-114:16, Ex. 11

**reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.** *See Abraham*, 183 F.3d at 294 ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."); *see also Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated."). **Thus, even were we to assume that shooting at the Taurus was reasonable at the moment it was backing up toward O'Donnell, that does not necessarily make his firing at the vehicle when it was driving away from him equally reasonable.**

560 F.3d 404, 413 (5th Cir. 2009) (emphasis added).

Therefore, assuming *arguendo* that Salazar and Thompson engaged in a physical struggle when Thompson attempted to handcuff Salazar, and further assuming that such a physical struggle may have justified Thompson's use of deadly force, any such threat passed when Salazar broke free, turned his back to Thompson and started walking away. Accordingly, Thompson is not entitled to qualified immunity for a shooting that occurred well after Salazar had begun retreating from him.

    a.   <u>At the Time of the Shooting, Salazar Posed No Immediate Threat that Would Justify Thompson's Use of Deadly Force</u>

Thompson initially pulled Salazar over for allegedly speeding.[28] It is undisputed that Salazar remained calm and sat in his truck while Thompson ran a search on Salazar's identification and license plate number, whereby Thompson learned that Salazar had no open warrants or charges. Thereafter, Thompson commanded that Salazar exit his truck and stand between the truck and Thompson's patrol car. According to Salazar, Thompson pulled out handcuffs, told Salazar he was going to jail, and grabbed Salazar's right hand.[29] Because he was frightened and confused, Salazar pulled his hand away and turned his back to Thompson.[30]

---

[28] It should be noted that Salazar was neither charged with, nor convicted of, speeding in relation to the traffic stop that led to the shooting made the basis of this lawsuit.
[29] Salazar Depo at 25:14-26:5, Ex. 1
[30] Salazar Depo at 26:1-10, Ex. 1; Thompson Depo at 107:6-109:8, Ex. 2

Salazar then walked toward the front of his truck between the passenger side of his truck and the concrete barrier on the right shoulder of the highway.[31] At no time did Salazar and Thompson struggle; nor did they end up near lanes of traffic or the concrete barrier.[32] During this time, Salazar never said anything or threatened Thompson.[33] At no time did the other passengers in the vehicle get out or otherwise threaten Thompson.[34] As Salazar continued to walk away, Thompson drew his weapon and pointed it at Salazar, giving a single command for Salazar to stop while almost simultaneously firing one shot into Salazar's back.[35]

Viewing the facts in the light most favorable to Salazar, as the court must at the summary judgment stage, there is no doubt that Salazar has shown that Thompson's use of deadly force was clearly excessive and objectively unreasonable. At the moment Thompson shot Salazar in the back, Salazar was unarmed, walking away with his back turned, and had created several feet of distance between them. In addition, the undisputed facts are that Thompson never saw a weapon, anything shiny like a weapon, or anything at all in Salazar's hand,[36] Salazar never retrieved anything from his truck, the passengers made no attempt to hand anything to him.[37] Salazar never lunged at Thompson, reached at his waistband when exiting his truck (or any other time), nor did he quickly spin and charge.[38]

There is simply no undisputed evidence justifying Thompson's use of deadly force against Salazar. Following Thompson's attempt to handcuff Salazar, most of Defendants' "undisputed" facts are actually very much in dispute, especially in regards to whether Salazar posed any threat, immediate or not, to Thompson at the time he discharged his weapon. *See*

---

[31] Salazar Depo at 26:11-25, Ex. 1; Thompson Depo at 113:1-9, Ex. 2
[32] Salazar Depo at 26:14-27:10, Ex. 1
[33] Salazar Depo at 29:3-14, Ex. 1
[34] Thompson Depo at 137:7-14, Ex. 2
[35] Salazar Depo at 27:15-28:3; 29:15-24, Ex. 1; Thompson Depo at 114:21-115:13, Ex. 2
[36] Thompson Depo at 114:10-20; 119:16-23, Ex. 2
[37] Thompson Depo at 130:9-13, Ex. 2
[38] Thompson Depo at 167:21-169:10, Ex. 2

*United States v. White*, 258 F. 3d 374, 383 (5ᵗʰ Cir. 2001) ("A threat imports '[a] communicated intent to inflict physical or other harm'" (quoting Black's Law Dictionary 1480 (6th ed. 1990))). A rational jury could find that Thompson's use of deadly force was excessive and that he is not entitled to qualified immunity. *Sanchez v. Fraley*, 376 Fed. Appx. 449, 450 (5th Cir. 2010); *see also Reyes*, 362 Fed. Appx. at 408 (reversing summary judgment where the plaintiff's version of events did not include any act justifying deadly force). As in *Fraley*, it is undisputed that Salazar was unarmed when he was shot and paralyzed, and there were no "undisputed actions" by Salazar justifying the use of deadly force that occurred at the moment Thompson shot Salazar in the back. *See Fraley*, 376 Fed. Appx. at 452.

For further evidence showing that Thompson's use of deadly force against Salazar was clearly excessive, and thus, objectively unreasonable, the court should consider the opinions of the parties' expert witnesses. Keith Howse, Salazar's retained liability expert, opines that Thompson's use of deadly force, rather than a lesser degree of force (baton, taser) which Thompson had available to him, was clearly excessive and objectively unreasonable under the circumstances, even if the facts leading up to the shooting transpired as Thompson testified during his deposition.[39] Even more compelling is the fact that Defendants' own experts both agree that deadly force was not appropriate under this fact pattern.[40]

Defendants attempt to compare this case to *Tolan v. Cotton*, where the Fifth Circuit affirmed the granting of a summary judgment for an officer. 713 F.3d 299, 301 (5th Cir. 2013). However, the cases have significant factual differences; first, a busy urban freeway with large, multi-bulb street lamps[41] is hardly the same as "[a] single gas lamp in front of [a] house and two motion lights in the driveway." *Tolan*, 713 F.3d at 302. In addition, Salazar was not suspected of

---

[39] Howse report at 8 and 32-34, Ex. 34
[40] Provost Depo, 43:19-25; 44:19-22, Ex. 9; Bratton Depo at 47:22-48:16, Ex. 4
[41] Howse Depo at 155:17-156:12, Ex. 11; There is also a fact question as to whether the lighting would allow Thompson to see Salazar's hands. Photographs of scene, Ex. 14

any felonies, nor was he ever arrested for a felony,[42] Plaintiff did not yell or curse at Thompson,[43] he was not even aware that Thompson had drawn his gun,[44] and there was not a "chaotic and confusing scene" in this case. *Id.* Most importantly, the Supreme Court recently vacated the Fifth Circuit's opinion, holding that the "the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." *Tolan v. Cotton*, No. 13-551, 572 U.S. ___, at *8 (May 5, 2014) (quoting *Anderson*, 477 U.S. 242 at 249 (1986)).[45]

Instead, the facts in this case are more akin to *Sanchez*, where the Court upheld the denial of a summary judgment based on qualified immunity. In *Fraley*, the police shot and killed a suspect based on the following facts:

> Detective Fraley testified in his deposition that he knew Sanchez was a suspect in a double homicide, and Detective Fraley also testified that he had heard on the police radio that Sanchez had a gun and had forcibly attempted to enter somebody's house. He testified further that Sanchez was digging in his waistband and pointing his hands under his shirt as though aiming a weapon.

376 Fed. Appx. at 452.

However, there was also an eyewitness whose version of events contradicted the officer's in many respects: she stated that the deceased had his hands at his side and had stopped running prior to being shot. *Id.* at 451-52. The parties also agreed that the deceased was unarmed when he was shot and killed. *Id.* at 451. In light of the witness's statement, the Court concluded that there were no "undisputed actions" justifying deadly force. Therefore, the Court was "compelled to agree with the district court that 'a rational jury could find that [Detective] Fraley's use of lethal force was excessive' and that he 'is not entitled to qualified immunity." *Id.* at 452.

---

[42] Thompson Depo at 100:9-11, Ex. 2; Harris County DA file at 13-15, Ex. 15
[43] Salazar Depo at 29:7–14, Ex. 1
[44] Salazar Depo at 27:15–28:4, Ex. 1
[45] A courtesy copy of the Court's opinion is attached, Ex. 16

b.  <u>Whether Thompson's Story Is Credible Must Be Determined By the Jury</u>

Any credibility determination to be made between Thompson's and Salazar's versions of events leading up to the shooting is inappropriate for summary judgment. *See Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) (citing *Bazan*, 246 F.3d at 492); *see also Abraham v, Raso*, 183 F.3d 279, 287 (3rd Cir. 1999). In *Bazan*, the only version of events leading up to a shooting was the officer's, since he had killed the victim. *Bazan*, 246 F.3d at 492-93. Naturally, the officer argued that the plaintiff didn't, and in fact couldn't, dispute his story. *Id*. at 491. Despite this, the Court explained that lack of corroborating evidence and physical evidence to support the officer's story was sufficient to create a fact issue precluding summary judgment. *Id*. at 492-93.

As in *Bazan*, the inconsistencies in Thompson's statements and complete lack of physical evidence of any struggle similarly preclude summary judgment here. According to Thompson's self-serving testimony, he and Salazar began to struggle, with Salazar first pushing him into oncoming traffic and then trying to push him off the overpass.[46] However, despite the extensive struggle that put him in "fear of his life," he had no injuries whatsoever, not even scrapes or scuffs.[47] In addition, Thompson admits that he was not "slammed" against the freeway wall.[48]

Furthermore, a "mere motion to turn and face [the officer] are not compelling reasons to find that [the officer's] use of force was not excessive as a matter of law." *See Baker v. Putnal*, 75 F. 3d 190, 198 (5th Cir. 1996) ("Whether Putnal ordered Baker, Jr., to 'freeze' or to drop the pistol before Baker, Jr., turned toward him and whether Baker, Jr., was even holding the pistol or pointing it at Putnal are certainly issues of fact material to whether Putnal's actions were excessive and objectively reasonable."). As in *Baker*, Thompson claims he twice instructed

---

[46] Thompson Depo at 109:19–111:12, Ex. 2
[47] Thompson Depo at 153:19-20; 154:23-25; 168:6-9, Ex. 2; Sweatt Depo at 130:9-20, Ex. 3; Howse Depo at 123:7-123:25, Ex. 11; Photographs of Thompson, Ex. 17
[48] Thompson Depo at 111:2–12, Ex. 2

Plaintiff "let me see your hands, stop" as Plaintiff was walking along the side of the truck, and he only made the decision to shoot once he saw Plaintiff turn to the left and reach near his waistband,[49] but no mention of a turn was made until months after the shooting.[50] This is also inconsistent with the bullet wound that entered from Plaintiff's right side.[51] *See Baker*, 75 F. 3d at 198 ("[t]he nature of the wounds indicate that Baker, Jr., was not facing Putnal when he was shot," raising a question of fact as to the reasonableness of the shooting). Moreover, had Plaintiff turned to the right, he would have actually been turning *away from* Thompson, who was to Plaintiff's left, taking cover behind the truck.[52] A jury could also find that, by raising his hands, Salazar was in fact complying with Thompson's orders,[53] or that Thompson should have used his TASER X26, since Salazar was within the 21-foot range.[54]

### 3. In October 2010, It Was Clearly Established That a Police Officer Violates Fourth Amendment Rights by Shooting a Suspect Who is Unarmed and Poses No Immediate Threat of Harm

For the second prong at the summary-judgment stage, Salazar must similarly show a genuine dispute of material fact for two distinct, but intertwined, elements: "whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether Thompson's conduct was objectively unreasonable in the light of that then clearly established law." *Clayton*, 547 Fed. Appx. at 649-50 (quoting *Hare v. City of Corinth, Miss.,* 135 F.3d 320, 326 (5th Cir. 1998)).

For the law to be clearly established, there is no requirement of a case with the exact same factual scenario. *Reyes v. Bridgewater*, 362 Fed.Appx. 403, 408 (5th Cir. 2010). Instead, the question is whether the law clearly set parameters under which an objectively reasonable

---

[49] Thompson Depo at 114:21–116:8; 118:8-119:7; 168:3–5, Ex. 2; Jackson Depo at 82:5-15, Ex. 7
[50] IAD file at pg. 59-63, Ex. 18
[51] Salazar Ben Taub records at 33, Ex. 13; Allen Depo at 72:11-73:23, Ex. 8; IAD file at pg. 171, Ex. 18. Curiously, although its witnesses testified to a left turn, Defendants' Motion agrees that the entry-wound contradicts this.
[52] Thompson Depo at 119:24-120:17; 137:3-6, Ex. 2; Sweatt Depo at 126:15-18, Ex. 3
[53] Bratton agrees a shooting would not be justified in that case. Bratton Depo at 113:20-114:8, Ex. 4
[54] Thompson Depo at 113:16–18, Ex. 2, Provost Depo at 126:18-127:13, Ex. 9

officer would know what is permissible and what is excessive. *See Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) ("The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.' " (quoting *Hope*, 536 U.S. at 740).

Prior to this shooting, it had long been established that wounding or killing a suspect by shooting him constitutes a seizure. *Flores*, 381 F. 3d 391 at 400 (clearly established that shooting toward a person is a use of physical force and physical force that succeeds in stopping a fleeing suspect constitutes a seizure). The law was also clear that it was objectively unreasonable to use deadly force against a suspect who was unarmed, walking away from an officer, and posed no threat to the officer. In fact, the Court in *Fraley*, summarized the law on deadly force mere months before this shooting:

> The relevant conduct in this case occurred on April 23, 2007, but it was clearly established well before that date that "deadly force violates the Fourth Amendment *unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others,' " *Bazan*, 246 F.3d at 488 (quoting *Garner*, 471 U.S. at 11), and that the threat of serious physical harm must be "immediate," *Garner*, 471 U.S. at 11.

*Sanchez*, 376 Fed.Appx. at 452-53.

In this case, the facts are clear (under either Salazar's or Thompson's version of events) that Salazar presented no such immediate threat of serious bodily harm to Thompson. *See Reyes*, 362 Fed.Appx. at 409. Accepting Salazar's version of events, as the court must, there was no immediate threat to justify Thompson's use of deadly force. *Fraley*, 376 Fed.Appx. at 452-53.

## 4. By Prevailing on His Excessive Force Claim, Plaintiff Will Not Invalidate His Conviction for Resisting Arrest; Regardless of Whether the Initial Detention/Arrest Was Justified, the Subsequent Shooting Was Not

Under *Heck v. Humphrey*, it is well settled that when an individual brings a section 1983 claim against the arresting officers, "the district court must first 'consider whether a judgment in

favor of the plaintiff would **necessarily** imply the invalidity of his conviction or sentence.'"
*Hainze v. Richards,* 207 F.3d 795, 798 (5th Cir.2000) (quoting *Heck v. Humphrey,* 512 U.S. 477,
487 (1994)) (emphasis added). If so, the claim is barred unless he proves that his "conviction or
sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a
state tribunal authorized to make such determination, or called into question by a federal court's
issuance of a writ of habeas corpus." *Heck,* 512 U.S. at 487.

First, it appears that Defendants' *Heck* argument refers only to Plaintiff's DWI
conviction; however, as noted above, Plaintiff is not challenging his DWI arrest at this point.
Thus, although *Heck* might bar any claims for false arrest, such arguments are irrelevant and
moot here. *See Daigre v. City of Waveland, Miss.*, No. 12-60863, 2013 WL 6645390 (5th Cir.
Dec. 18, 2013). Instead, Plaintiff's claims in this lawsuit focus exclusively on Thompson's use of
excessive and deadly force *subsequent to* any initial detention or arrest.

Second, to the extent that *Heck* applies to excessive force claims, the bar is *not automatic*,
and how *Heck* applies to excessive force claims is not always clear. *Arnold v. Town of Slaughter*,
100 Fed. Appx. 321, 323 (5th Cir. 2004). As the Fifth Circuit explained in *Arnold*:

> By proving an excessive force claim, a plaintiff will not invariably invalidate his
> conviction. *See Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996). Other
> circuits have emphasized the conceptual difference between an excessive force
> claim and a challenge to a conviction. Both the Ninth and Third Circuits have
> indicated that an excessive force claim would not necessarily challenge a
> plaintiff's conviction for assault during a stop. *Nelson v. Jashurek*, 109 F.3d 142,
> 145-46 (3d Cir. 1997); *Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir. 1996).

*Id.*

Therefore, in order to determine whether *Heck* precludes Plaintiff's section 1983 claims here
that Thompson used excessive force by shooting him in the back, the question is whether a
judgment in Plaintiff's favor on these claims would necessarily imply the invalidity of his

conviction for resisting arrest; it would not. *See Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008)

Specifically, the *Heck* determination depends on the nature of the offense and of the claim. *Arnold*, 100 Fed. Appx. at 324. Salazar was convicted only of two misdemeanor charges; the first, DWI, is a crime for which none of the statutory elements, standing alone, would justify the use of deadly force,[55] especially when Plaintiff was not charged with causing any injury.[56] The other misdemeanor, resisting arrest, might, in some circumstances, justify the use of deadly force; however, as the Court noted in *Arnold*, "while the [resisting arrest] statute provides many ways of committing the offense," Salazar was charged specifically, and only for, "pushing [the officer] with his hand,"[57] and that is the specific offense for which he pled *nolo contendere*. Since it is beyond question that this action alone could not justify the use of deadly force against Plaintiff, his claims in this lawsuit based on the shooting by Thompson, a separate and independent event from any actions surrounding the initial detention, is not barred by *Heck*.

Indeed, this case presents the situation contemplated by the Court in *Arnold*:[58] Plaintiff's claims here are "that the police used excessive force *after* he stopped resisting arrest or that the officers used excessive and unreasonable force *to stop* his resistance." *Arnold*, 100 Fed. Appx. at 324. In other words, Plaintiff specifically challenges the use of excessive, and deadly, force despite in response to the conduct for which he was charged.

In the case cited by Defendants, *Garrick v. Thibodeaux*, in addition to resisting arrest, the plaintiff had been convicted of battery of a police officer during the same encounter. 174 F.3d 198, No. 98-30506 (5th Cir. 1999). More importantly, although not entirely clear, the plaintiff appeared to be making only a generalized excessive force claim. *Id*.

---

[55] *See* TEX. PEN. CODE § 49.04
[56] Harris County DA file at 13-14, Ex. 15
[57] Harris County DA file at 15, Ex. 15
[58] The plaintiff in *Arnold* did not allege such a situation.

**B.      HPD IS LIABLE FOR A FACIALLY DEFICIENT USE OF FORCE POLICY**

Generally, municipalities are not liable for the constitutional torts of their employees unless those employees act pursuant to an official action or approval. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 663 n. 7, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Rather, to impose liability, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Hous.,* 237 F.3d 567, 578 (5th Cir. 2001). Therefore, in order to assert a claim for municipal liability under §1983, a plaintiff must establish "proof of three elements in addition to the underlying claim of a violation of rights: `a policymaker; an official policy; and a violation of constitutional rights whose `moving force' is the policy or custom.'" *Cox v. City of Dallas, Tex.,* 430 F.3d 734, 748 (5th Cir. 2005) (citing *Piotrowski v. City of Houston,* 237 F.3d at 578) (internal citation omitted). In order to demonstrate a causal link between the municipal action and the deprivation of constitutional rights, "a plaintiff may demonstrate either an express policy or a `persistent, widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Hinojosa v. Butler,* 547 F.3d 285, 296 (5th Cir. 2008) (citing *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir. 1984) (en banc)).

**1.   HPD's Use of Force Policy Violated Salazar's Constitutional Rights Because It Allows for Deadly Force Even When There Was No Immediate Threat**

As set forth, *supra,* at Section A, Salazar has established that Thompson violated Salazar's Fourth Amendment right to be free from unreasonable seizure by shooting him in the back during a traffic stop. To prove that the City of Houston is liable for Thompson's violation of Salazar's constitutional rights, Salazar must show: (1) a policymaker with authority to promulgate policies regarding the use of deadly force by HPD officers; (2) an official policy

regarding the use of deadly force; and (3) that the official policy was the "moving force" behind

Thompson's unjustified use of deadly force against Salazar.

HPD's written Use of Force policy is contained in General Order 600-17, and, like all

HPD policies, it is issued by the Chief of Police.[59] HPD's Chief of Police is a "policymaker" for

the purpose of Salazar's § 1983 claim against the City of Houston. *See Webster v. City of

Houston*, 735 F.2d 838, 842 (5th Cir. 1984); *see also* City of Houston Code of Ordinances, Ch.

34 § 34-22.

Excluding a section for shooting at vehicles, the HPD policy on deadly force contains

barely 100 words:[60]

> The use of deadly force will be limited to those circumstances in which officers
> reasonably believe it is necessary to protect themselves or others from the
> imminent threat of serious bodily injury or death. Officers will consider their
> immediate surroundings and the safety of un-involved citizens before using
> deadly force.
>
> Employees will not justify the use of deadly force by intentionally placing
> themselves in imminent danger.
>
> Officers are prohibited from using firearms in the following ways:
>   a. Firing warning shots,
>   b. Firing at fleeing suspects who do not represent an imminent threat to the
>   life of the officer or another,
>   c. Firing at suspects whose actions are a threat only to themselves (e.g.,
>   attempted suicide).

As written, HPD's current Use of Force policy is unconstitutional on its face because it

misstates the legal standard regarding when the use of deadly force by law enforcement officers

is permissible and authorizes officers to use deadly force in situations beyond those permitted by

longstanding, clearly established federal law.

There is no doubt that the most significant and "intrusive" use of force is the use of

deadly force, which can result in the taking of human life, "frustrat[ing] the interest of . . .

---

[59] General Order 600-17, Ex. 19
[60] General Order 600-17, Ex. 19

society in judicial determination of guilt and punishment." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). As the Supreme Court explained almost thirty years ago, "[i]t is not better that all felony suspects[61] die than that they escape. Where the suspect poses no *immediate threat* to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* The Fifth Circuit has echoed this standard. *See, e.g., Lytle,* 560 F.3d at 413 ("a jury could conclude that any *immediate threat* [to the officer] had ceased"); *Sanchez,* 376 Fed.Appx. at 452-53 ("the threat of serious harm must be '*immediate*'") (quoting *Garner,* 471 U.S. at 11).

Although the words have *similar* meanings, "immediate" and "imminent" are not *equivalent.*[62] Despite this difference, HPD's current Use of Force policy authorizes its officers to use deadly force where only an "imminent threat" exists.[63]

The facial unconstitutionality of HPD's current written Use of Force policy becomes more apparent when compared to its predecessor. HPD's former written Use of Force policy, General Order 600-17 (issued February 15, 1987), contained the correct legal standard for when deadly force may be lawfully used, stating that:

> The basic responsibility of police officers to protect life also requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of firearms. Police officers are equipped with firearms as a means of last resort to protect themselves and others from the **immediate threat of death or serious bodily injury**. Even though all officers must be prepared to use their firearms when necessary, the utmost restraint must be exercised in their use.

*Holland ex rel. Holland v. City of Houston*, 41 F. Supp. 2d 678, 700-01 (S.D. Tex. 1999) (emphasis added). Thus, although the controlling law has remained the same for the past thirty years, HPD has made the conscious decision to change its written Use of Force policy to broaden

---

[61] There is no evidence that Salazar-Limon was a felony suspect; he was only arrested on misdemeanor charges. The constitutional limitations on the use of deadly force should apply even more stringently to protect a misdemeanor suspect who poses no immediate threat to the life or safety of the officer or others.

[62] Howse report at 20, Ex. 34

[63] General Order 600-17, Ex. 19; Howse Depo at 120:20 – 122:20; Howse report at 21, Ex. 34

the definition for when its officers may use deadly force. Given the longstanding and clearly established nature of the law regarding the "immediate threat" requirement, there is no justification for the City of Houston's promulgation of a written Use of Force policy that fails to comport with federal law.

Not only does HPD's current Use of Force policy set forth an improper legal standard for the permissible use of deadly force, it is extremely vague and provides little guidance as to when deadly force is authorized, leaving it entirely up to the officer's discretion.[64] The policy nowhere defines "imminent" or "imminent threat," making it impossible for officers to discern, much less comply with, the standards of conduct required of them under the policy (or the law).[65] Moreover, the policy fails to set forth the "*Graham* factors"[66] that an officer must consider before electing to use deadly force.[67] For all of these reasons, the HPD current Use of Force policy in effect at the time of this shooting was unconstitutional on its face.

## 2. Deliberate Indifference

Knowledge on the part of a policymaker that a constitutional violation will most likely result from a given official custom or policy is a *sine qua non* of municipal liability under §1983. The requirement that a policymaker be charged with actual or constructive knowledge of the policy that inflicts the alleged injury follows from the principle that *respondeat superior* is unavailable against a municipality under § 1983. *See Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002). Thus, for municipal liability to attach under section 1983 a plaintiff must demonstrate "[a]ctual or constructive knowledge of such policy or custom ... attributable to the

---

[64] Thompson Depo at 49:8-24, Ex. 2; Provost Depo at 46:20–47:8, Ex. 9
[65] General Order 600-17, Ex. 19; Thompson Depo at 180:9-16, Ex. 2; Howse report at 22, Ex. 34
[66] The four *Graham* factors are (1) the severity of the crime at issue; (2) whether the subject poses an immediate threat to the safety of the officers or others; (3) whether the subject is actively resisting; and (4) whether the subject is attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.
[67] Also disconcerting is the inability of the officers, *including Defendants' designated experts*, to correctly articulate the *Graham* factors in their depositions, even after having an opportunity to meet with a City attorney. Thompson Depo at 53:25–54:12, 73:7-16, Ex. 2; Sweatt Depo at 52:17–53:17, Ex. 3; Bratton Depo at 55:12–56:16, Ex. 4; Provost Depo at 203:3–205:8, Ex. 9.

governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984).

Where, as here, an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur. *See Piotrowski v. City of Houston,* 237 F.3d 567, 579 (5th Cir.2001). Therefore, the summary judgment evidence establishes that Defendant City of Houston is not entitled to summary judgment on Salazar's §1983 claim based on its facially unconstitutional written Use of Force policy.

**3.   HPD's Written Use of Force Policy Was a Moving Force Behind the Shooting of Salazar**

According to Thompson, he was taught that under the Use of Force policy it is basically up to the officer's discretion whether to use deadly force; HPD supervisors "will not tell you when and when not to use your weapons," but will simply leave it up to a grand jury to make the decision *afterwards*.[68] It is clear from Sweatt's testimony that, although the law is based on objective reasonableness, HPD's policy is entirely subjective: "Yes. I mean it can change between what you believe and what I believe."[69] Thompson also describes "imminent" in incredibly broad terms that would appear to include almost any situation in which an officer might have a fear of harm.[70] In reaching the decision to shoot Salazar, Thompson relied on his understanding of HPD's Use of Force policy and his training to decide that a suspect allegedly reaching at his waistband constituted an "imminent threat" under the broad, subjective definition contained in the written policy.[71]

---

[68] Thompson Depo at 51:7-18, Ex. 2
[69] Sweatt Depo at 48:5–20, Ex. 3
[70] Thompson Depo at 52:6-13, Ex. 2; *See* Howse report at 14, Ex. 34
[71] Thompson Depo at 131:20–132:7, Ex. 2; Howse Depo at 118:19–119:5; 121:20–122:20, Ex. 11

### C.     HPD IS LIABLE FOR THE FAILURE TO TRAIN ITS OFFICERS IN WHEN TO USE DEADLY FORCE

Inadequacy of police training may serve as the basis for § 1983 liability against a municipality where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To succeed on a failure-to-train claim, a plaintiff must establish (1) inadequate training procedures, (2) that inadequate training procedures caused the injury, and (3) deliberate indifference of municipal policymakers. *Pineda*, 291 F.3d 325 at 332.

### 1.  HPD Failed to Provide Adequate Situational and Decision-Based Firearm and Deadly Force Training

In additional to an officially adopted policy, as discussed above, an official policy is a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000). Both HPD's official training program and policies, as promulgated by the Chief,[72] along with the real-world implementation of those policies, are deficient as shown herein.

"In resolving the issue of a city's liability [for failure to train], the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 391. Although Defendants and their experts heavily emphasize the fact that HPD requires twice the state-mandated number of in-service hours, HPD's mere compliance with state requirements does not provide *per se* immunity from a failure to train claim. *Hobart v. City of Stafford*, 784 F.Supp.2d 732, 754 (S.D. Tex. 2011) (citing *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170–71 (5th Cir. 2010); *Roberts v. City of Shreveport*,

---

[72] Bratton Depo at 79:10-19, Ex. 4; Provost Depo at 48:25–49:7, Ex. 9

397 F.3d 287, 293–95 (5th Cir. 2005)). In addition, there is no evidence HPD's Academy and programs are even accredited.[73]

    a.   The Decisional, or "shoot, don't shoot," Training Was Inadequate

Defendants' experts agree that HPD officers will encounter dangerous suspects, fleeing suspects, and make arrests for traffic stops, so there is a need training in use of force to prevent injuries/death,[74] and that classroom based use of force training by itself is insufficient.[75] It is also common knowledge that firearms training, including when to shoot, is a perishable skill that must be frequently reinforced through ongoing training and evaluation.[76] Indeed, HPD's training materials acknowledge the need for "repetition under stress" and that "textbook/lecture =/= experiential learning."[77]

According to Bratton,[78] the Academy[79] training consists of the state-mandated six month Basic Peace Officer course, a majority of which is simply classroom instruction on intro topics such as relevant statutes, the history of police work and HPD, "certain ways of doing police work," arrest, search, and seizure, including handcuffing a suspect.[80] They also addressed topics like how to hold the gun, shooting stances, reloading, cleaning, disassembling and reassembling the gun, and the HPD general order on use of force and force continuum.[81] Lambert[82] identifies additional firearm-related courses, but none involve a decisional aspect, including shotgun and

---

[73] Bratton Depo at 97:3-12, Ex. 4; Howse Depo at 119:6–24, Ex. 11
[74] Provost Depo at 45:11–48:4, Ex. 9; Howse report at 29-30, Ex. 34
[75] Bratton Depo at 137:17-138:2, Ex. 4; Lambert Depo at 30:7 - 30:25
[76] Lambert Depo at 31:1–10; 76:16–77:4, Ex. 5; Sweatt Depo at 64:9–18, Ex. 3; Howse report at 27, Ex. 34
[77] Strategic Response slides, Ex. 20
[78] Bratton is part of the Officer Safety Unit, which is the unit most concerned with use of force training. Bratton Depo at 15:2–16:2, Ex. 4; Lambert Depo at 23:8–15, Ex. 5
[79] The HPD Academy consists of three units: Defensive Tactics, Officer Safety, and Firearms Training
[80] Thompson Depo at 29:6-30:19, Ex. 2; Bratton Depo at 18:1-19:4; 25:19-25; 29:13-20, Ex. 4
[81] Sweatt Depo at 17:14-20:8, Ex. 3
[82] Lambert has been part of the Firearms Unit since 1989. Lambert Depo at 9:5-7; 11:22-12:9, Ex. 5

maintenance, which concerns maintaining weapons to prevent jams and misfires, and cover and concealment, which he states is simply part of the stress course.[83]

In addition, Lambert states that they go over deadly force training, but it consists solely of classroom, not hands-on, training, it appears the firearm unit has no course involving simunition, such as marking cartridges or blanks, nor do they have live fire training for patrol officers.[84] Vashaw could not recall any "shoot, don't shoot" training during his time at the Academy in the early 1980s.[85] Thus, although Lambert asserts that they conduct some decisional training with firearms, it is apparent that his unit is focused almost exclusively on the handling and mechanical aspects of firearms, such as how to use them properly.

Bratton also describes seven phases of "field problems," which he claims include scenario-based training.[86] However, only phases four through six, where cadets are dispatched to simulated service calls with role-playing officers who may provide some resistance, involve "shoot, don't shoot" decisionmaking,[87] but, the cadets are only evaluated in four areas, which do not include deciding when to shoot.[88] Thus, there is no evidence that cadets actually discharge any weapon or simunition during these scenarios. The final phase involves a "stress course," but it is not graded, and Thompson describes it as simply involving running around, then locating and shooting a single target.[89] In total, the firearms related training lasts about two weeks.[90]

After completing the Academy, the cadets become probationary police officers ("PPO")[91] and go through HPD's eleven week Field Training Program, which consists of four main phases,

---

[83] Howse report; Lambert Depo at 13:25-15:17; 16:8-23; 18:21–22:15, Ex. 5
[84] Lambert Depo at 22:16-21; 23:8-15; 26:25-27:18, Ex. 5; Sweatt Depo at 18:1-20:8, Ex. 3
[85] Vashaw Depo at 15:21-16:6; 17:22-25, Ex. 6
[86] Bratton Depo at 18:1-19:4, Ex. 4
[87] Bratton Depo at 29:13-31:18, Ex. 4
[88] Howse report at 25, Ex. 34; Bratton Depo at 31:1-5; 33:1-11, Ex. 4
[89] Bratton Depo at 31:20–32:7, Ex. 4; Thompson Depo at 58:5–59:6, Ex. 2
[90] Howse report at 24, Ex. 34
[91] Bratton Depo at 25:19-26:3; 29:18-19, Ex. 4

each lasting about three weeks and containing a checklist of topics to be covered.[92] Although the PPOs *may* encounter some use of force scenarios, the program is focused more on officer safety, and PPOs are not specifically put into situations where they must decide whether to use force and what type.[93] Nor is there a task involving active shooters.[94]

After Field Training, HPD requires its officers to complete forty hours of in-service training each year, but there are no courses specifically required on an annual basis, including scenario-based "shoot, don't shoot" training.[95] In his expert report, Bratton identifies thirteen courses that he claims provided Thompson with training relevant to this lawsuit.[96] One is simply the basic Academy training course, and one is completely unrelated to use of force.[97] Six are classroom only courses with no hands-on or practical component.[98] And three of the remaining in-service courses have some practical aspects, but only somewhat address use of force.[99]

Thus, only two of Thompson's in-service courses appear to directly provide scenario-based use of force firearms training. Tactical Pistol October 2008 was a one-day course about gun handling, shooting stances and reloading.[100] It also included some target shooting consisting of an instructor simply holding a sign that said "shoot" or "don't shoot," and there was no actual exam or test.[101] Response to Active Shooter May 2008 is a two-day course that involved going into a situation where the suspect had taken hostages and trying to locate and shoot him using simunition, while not shooting civilians.[102] Thompson also mentions Tactical Shotgun and

---

[92] Vashaw Depo at 28:17-31:9; 42:22-43:7; 52:18-53:19, Ex. 6; Field Training manual, Ex. 21
[93] Vashaw Depo at 64:21-65:25; 74:11-76:5; 78:11-19; 81:19-22, Ex. 6
[94] Vashaw Depo at 66:1-11, Ex. 6
[95] Thompson Depo at 55:16-58:1, Ex. 2; Bratton Depo at 33:12-34:10; 65:23-66:7, Ex. 4; General Order 400-05, Ex. 24
[96] Bratton Depo at 16:17-16:21, Ex. 4; Thompson certification record, Ex. 4a
[97] Howse report at 26, Ex. 34, Bratton Depo at 17:12-21, Ex. 4
[98] Howse report at 26, Ex. 34, Bratton Depo at 19:20-20:8; 23:13-25:3, Ex. 4; Thompson Depo at 42:13-22, Ex. 2
[99] Bratton Depo at 19:8-21:5, Ex. 4
[100] Thompson Depo at 38:3-22, Ex. 2; Bratton Depo at 22:21-23:5, Ex. 4
[101] Thompson Depo at 38:23-39:24, Ex. 2 Bratton Depo at 64:8-65:2, Ex. 4
[102] Thompson Depo at 37:3-38:2, Ex. 2; Bratton Depo at 21:6-22:14; 64:8-15, Ex. 4; Sweatt Depo at 31:22-33:2; 35:6-18, Ex. 3

Shotgun Select, both one-day courses, but they were only accuracy shooting.[103] In addition, the in-service training described by other officers also demonstrates a lack of situational, decision-based training. Sweatt describes various course, but besides the active shooter class and possibly intermediate use of force, they were either unrelated to firearms, classroom only, or not actually required by HPD.[104] Besides these, Lambert was unable to identify any mandatory decisional or low-light courses.[105]

Besides the Active Shooter course, the closest HPD gets to live, hands-on "shoot, don't shoot" training is through use of a shooting simulator.[106] At the Academy, each cadet uses the simulator exactly once, during a four hour period, with a group of fifteen cadets sharing the simulator.[107] As a result, each cadet only performs "one or two" scenarios during their entire time at the Academy.[108] As for in-service training, the shooting simulators were sent around to the patrol stations as a one time event, around 2008 or 2009, but it was not mandatory.[109] Moreover, despite having over 5,000 officers, HPD currently has only "one and a half" operational simulators, and, in fact, has never had more than three unit, while LAPD has one machine for each station.[110]

For these reasons, HPD officers only used the simulator once or twice, with Thompson last using prior to being transferred to the jail in March 2008, over two years prior to this shooting.[111] Even when used, there is no grade, passing score or exam given for the shooting simulator.[112] Nor were there any records kept to even demonstrate that an officer had trained on

---

[103] Thompson Depo at 35:3-36:6, 39:25-40:18, Ex. 2
[104] Sweatt Depo at 27:25–36:13, Ex. 3
[105] Lambert Depo at 32:23–33:23; 43:23–44:6, Ex. 5
[106] Bratton Depo at 57:21-58:13, Ex. 4
[107] Bratton Depo at 60:19-61:7, Ex. 4
[108] Bratton Depo at 61:2-10, Ex. 4
[109] Bratton Depo at 61:13-62:4, Ex. 4
[110] Howse report at 28, Ex. 34, Bratton Depo at 62:22-63:2, Ex. 4
[111] Vashaw Depo at 16:7-22, Ex. 6 (once); Buenik Depo at 35:5-36:12, Ex. 10 (once); Thompson Depo at 63:14-64:1; 14:13-23, Ex. 2 (twice)
[112] Bratton Depo at 62:9-15, Ex. 4; Sweatt Depo at 64:3-8, Ex. 3

the simulator.[113] The extent of HPD's firearms training is best summarized by Vashaw: "Man, all of [HPD's] training regarding firearms is more target. That's probably 90 percent of what I've done as far as training other than the low-light, per se, but, again, that was more target training than it was shoot/don't shoot."[114]

According to Howse, this lack of situational training is grossly inadequate.[115] He notes that it has long been standard practice for police departments to have situational firearms training on at least an annual basis.[116] In fact, when Howse worked at Baylor Health Care System police department, they had not only annual firearm qualification in the summer, but every winter each officer would also go through a mandatory 8 to 10 hour situational firearms program, that included a shoot house, Running Man targets, and shoot, don't shoot training.[117] Moreover, in a recent review of the New Orleans police department, the Department of Justice recommended 16 hours of mandatory firearms requalification per year, "incorporating a firearms/use of force requalification curriculum."[118]

    b.  <u>The "low/reduced light" training was inadequate</u>

HPD also has a lack of low-light firearms training for its officers. According to Provost, at least half of HPD's officer involved shootings occur at night,[119] which is consistent with experiences at other departments.[120] In fact, HPD's own training material indicates that:[121]

> -Nearly 75% of officer-involved shootings occur during low/no light conditions
> -Approximately 1/3 of those cases showed lighting conditions having a direct contributing factor to the outcome of the event
> -80% of how we perceive the environment around us comes through our visual sense

---

[113] Bratton Depo at 63:3-13, Ex. 4
[114] Vashaw Depo at 18:17-19:8, Ex. 6
[115] Howse Depo at 165:14-167:12, Ex. 11; Howse report at 29, Ex. 34
[116] Howse report at 27, Ex. 34
[117] Howse Depo at 56:18-58:9, Ex. 11
[118] Howse report at pg. 55-56 of Attachment F, Ex. 34
[119] Provost Depo at 56:15–57:24, Ex. 9
[120] Howse Depo at 153:25-154:25, Ex. 11
[121] Active Shooter, Ex. 22

Give that perception is so important, Bratton agrees that HPD wants its officers to have as much information as possible to make best decisions and that it's important to see what's going on and what, if anything, a suspect has in hands,[122] but at the same time there appears to be only minimal low-light training, especially as it relates to determining whether a suspect is armed. Although Bratton describes the field problems and firearms courses as being conducted in reduced lighting, Lambert confirms that those courses are only concerned with accuracy.[123] This includes the two low-light, or "stress-course," training described by Thompson at the Academy and the similar one that was added in 2011,[124] and this course, like all in-service low-light courses, was not mandatory.[125]

However, it is undisputed that Thompson hit his intended target; rather, the issue is whether he should have ever shot at someone who had nothing in his hands. Thus, as with HPD's other firearm training, Howse also describes HPD's low-light training as inadequate since it falls well below the recommended annual training, and lacks a decisional or shoot/don't shoot component.[126]

## 2.  HPD Was Deliberately Indifferent By Ignoring the Need for Additional Training

A plaintiff can prove the existence of a municipal custom or policy of deliberate indifference to individuals' rights in two ways. First, he can show that a municipality deliberately or consciously chose not to train its officers despite being on notice that its current training regimen had failed to prevent tortious conduct by its officers. *See Bryan County v. Brown,* 520 U.S. 397, 405 (1997). This generally requires that a plaintiff "demonstrate 'at least a pattern of similar incidents in which the citizens were injured ... to establish the official policy requisite to

---

[122] Bratton Depo at 50:25–51:6; 69:12–15, Ex. 4
[123] Bratton Depo at 66:8–67:2, Ex. 4; Lambert Depo at 20:5-21:11, Ex. 5; Vashaw Depo at 19:2–19:16, Ex. 6
[124] Sweatt Depo at 20:9-21:25; 35:19-36:4, Ex. 3; Vashaw Depo at 19:2-8, Ex. 6; Lambert Depo at 24:18–25:7, Ex. 5
[125] Bratton Depo at 69:16–70:4, Ex. 4
[126] Lambert Depo at 15:24-16:1; 17:8-18:5, Ex. 5; Howse report at 27, Ex. 34

municipal liability under section 1983.'" *Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir.1998)
(quoting *Rodriguez v. Avita,* 871 F.2d 552, 554–55 (5th Cir. 1989)). Second, under the "single
incident exception" a single violation of federal rights may be sufficient to prove deliberate
indifference. *See Bryan County,* 520 U.S. at 409.

As described herein, HPD's training program did not "enable officers to respond properly
to the usual and recurring situations with which they must deal" and, therefore, HPD's training
program was inadequate. *See City of Canton,* 489 U.S. at 390, n.10. Despite the obvious
importance of adequately training officers as to what circumstances warrant the use of deadly
force, HPD had a policy of inadequate training for officers to encounter real-life scenarios in
which deadly force should be used. HPD's policy of inadequate training was in conscious
disregard of the Constitutional rights of citizens who would predictably come into contact with
HPD officers in use of force situations.

a.  As the Courts Have Repeatedly Stated, the Need for Proper Training in the Use of
    Deadly Force is "So Obvious" That a Failure to Properly Train Constitutes Deliberate
    Indifference Even in the Absence of Pattern of Violations

Although "inadequate training" and "deliberate indifference" may be shown by frequent
prior violations of constitutional rights, a pattern is not a prerequisite to trigger municipal
liability when a plaintiff makes "[a showing of] a single violation of federal rights, accompanied
by a showing that a municipality has failed to train its employees to handle recurring situations
presenting an obvious potential for such a violation." See *Brown,* 219 F. 3d at 461 (quoting
*Board of County Comm'rs v. Brown,* 520 U.S. 397, (1997)). In other words, where the single
violation of civil rights at issue is a "highly predictable consequence of failure to train officers to
handle recurring situations with an obvious potential for such a violation," and there is direct
evidence of inadequate training (*i.e.* inadequate training is not sought to be established
circumstantially through a pattern of constitutional violations), evidence of specific incidents

which establish a pattern of constitutional violations is not necessary to put the city on notice that its training program is inadequate or to establish municipal liability. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 845 (10th Cir. 1997) (citations omitted); *see also Young v. City of Providence*, 404 F.3d 4, 28 (1st Cir. 2005) (finding evidence of deliberate indifference in failure to train without pattern of prior constitutional violations). Indeed, in *Brown*, the Fifth Circuit emphasized that the mere failure to train is deliberate indifference:

> Finally, we think that *City of Canton* again spoke to the facts in this appeal in footnote ten. There it observed that it is a fact to a moral certainty that police officers are required to arrest fleeing felons. **Thus, when the city arms its officers to carry out this task, there is thus the obvious need to train officers in the constitutional limitations on the use of deadly force. This need for training is so obvious that the failure to train is deliberate indifference to constitutional rights.**

*Brown*, 219 F.3d at 450 (5th Cir. 2000).

Although *Connick v. Thompson* declined to extend single-incident theory to *Brady* violations, the Court **did not eliminate** it. 131 S. Ct. 1350, 1360 (2011). To the contrary, the Court in *Connick* actually reiterated the core holding in *Canton*, that the need for deadly force training is blatantly obvious:

> Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty., supra,* at 409, 117 S.Ct. 1382.

*Connick,* 131 S. Ct. at 1361 (emphasis added).

Finding that prosecutors are provided legal training in law school, the Court then declined to extend *Canton* for "[f]ailure to train prosecutors in their *Brady* obligations." *Id.*

As the Fifth Circuit has also recognized, guns constitute the "paradigmatic example of 'deadly force.'" *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998). Thus, "[w]hether to use deadly force in apprehending a fleeing suspect qualifies as a 'difficult choice'

because more than the application of common sense is required." *Walker v. City of New York*, 974 F.2d 293, 298 (2nd Cir. 1992); *see also Connick*, 131 S. Ct. at 1361 ("Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training. "). For that reason, there can be no doubt that a "highly predictable" consequence from a failure to train in the proper use of deadly force is the death or injury of a citizen.[127] *See Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010).

> b. <u>Ignoring the Obvious Need for Situational Deadly Force Training, HPD Made the Conscious Decision to Not Require Such Training for Its Officers</u>

For over thirty years, courts have recognized the particularly important need for training in the use of deadly force. In one of the first cases, *Popow v. City of Margate*, the Court held training to be inadequate, where, besides the initial Academy training:

> The only continuing training was shooting instruction approximately every six months at a range in Atlantic County. However, there was no instruction on shooting at a moving target, night shooting, or shooting in residential areas. Margate is almost completely residential. The possibility that a Margate police officer will in the course of his duties have to chase a suspect in a residential area at night is not in the least remote; therefore, a finder of fact could determine that the City of Margate's training of officers regarding shooting was grossly inadequate within the *Leite* standard. **Furthermore, the officers viewed no films or participated in any simulations designed to teach them how the state law, city regulations or policies on shooting applied in practice.**

476 F.Supp. 1237, 1246 (D.N.J. 1979) (emphasis added).

Similarly, in *Zuchel v. City and County of Denver*, the Tenth Circuit upheld a verdict for the plaintiff where he had shown a failure on the part of Denver to provide adequate "shoot, don't shoot" training. 997 F.2d 730, 734-35 (10th Cir. 1993). As in *Zuchel*, Howse opines in his report

---

[127] *See* Howse Depo at 83:11-20, Ex. 11

that by failing to provide decisional "shoot, don't shoot" training, HPD's firearm training program is "grossly inadequate."[128]

When compared to a recent case, the gross inadequacy of HPD's training becomes apparent. In *Young v. City of Providence*, the district court rejected a "failure to train" claim and granted summary judgment where, in addition to the basic 1,000 hours of training:

> Recruits received "shoot/no-shoot" training at a firing range. At the firing range, different paper "cut-outs" were positioned in various ways, including behind other targets. The "cut-outs" included a plainclothes officer with a badge. Officers were required to make a determination as to whether to fire at the target.
>
> Additionally, over a two-week period, each recruit participated in 14 different role-playing scenarios at Camp Varnum, which had been set up to resemble a small city. Recruits were "dispatched" to the various situations. The scenarios required recruits to make shoot/no-shoot determinations. A number of the scenarios involved off-duty or plainclothes officers. The scenarios also involved the use of "cover" and the giving of appropriate commands when confronted with an armed suspect. A critiquing period followed each role-playing session. The critique included discussion of whether the off-duty officer acted appropriately.
>
> . . .
>
> Providence police officers also received post-Academy, "in-service" training pertaining to shoot/no-shoot determinations, "cover", the use of verbal commands, and off-duty situations. Such training included the use of a computer simulator ("Range 2000") and paint ball training, both of which required officers to respond to various scenarios. Solitro received Range 2000 training. Range 2000 training required shoot/no-shoot determinations, issuing verbal commands and taking of cover.

301 F. Supp.2d 163, 176-77 (D.R.I. 2004) (internal citations omitted).

However, the appellate court reversed, holding that even this training was not sufficient to dismiss the failure to train claim at the summary judgment stage in light of conflicting evidence about what exactly the training consisted of. *Young*, 404 F. 3d at 10. In doing so, the Court pointed to a lack of documentation that the training even occurred and especially noted that the testimony of the training officers was "self-serving." *Id.* at 27-28. In contrast to *Young*, HPD had

---

[128] Howse report at 29, Ex. 34

even less "shoot, don't shoot" training; HPD's target practice tested only accuracy and did not involve any decision as to whether the officer should fire his weapon; there was limited, if any, scenario based training provided to cadets at the Academy; and HPD's in-service training did not include any paint ball, or similar, training, nor was the shooting simulator mandatory.

In addition, as in *Young*, there are similar inconsistencies in training as described by Bratton compared to the other officers, and no documentation exists to prove that its officers trained with the simulator, or underwent any "shoot, don't shoot" training. *See also Russo v. City of Cincinnati,* 953 F.2d 1036, 1046–47 (6th Cir. 1992) (reversing summary judgment on failure to train claim and citing as grounds the frequency with which the police officers confronted disturbed individuals, the officers' inability to give specific responses as to the content of their training, and expert testimony regarding the adequacy of city's training).

Thus, for over thirty years, it has been established that law enforcement agencies must conduct firearms training on a regular basis; the firearms training must reflect the environment that officers are likely to face, *i.e.* moving targets, moving officers, low-light conditions and residential areas if applicable to the agency being trained; and finally agencies must conduct decision making training with respect to when to use deadly force. Annual or semi-annual accuracy qualification courses are simply insufficient for purposes of assisting officers in making deadly force decisions and for purposes of avoiding liability. The need for training on "when to shoot" is now accepted fact among the courts, and the Department of Justice has also stressed the importance of providing more than just classroom lectures.[129] In fact, Defendants' expert, Bratton, agrees with the need for deadly force training and recognizes the strong possibility of

---

[129] Howse report at pg. 56 of Attachment F, Ex. 34

death or injury to citizens if officers are not trained,[130] and Lambert also agrees that classroom-only training is not sufficient.[131]

Ironically, HPD previously had, as part of their training program, a tactical training village or "Hogan's Alley" course with running targets, moving targets, and popup targets, which Sweatt and Vashaw recalled going through early in their careers.[132] However, it apparently never worked as intended, and because of mechanical issues HPD decided to change it into their qualification range, with stationary targets, and eventually decided to completely shut it down prior to 2000.[133] It was replaced by a shoot house that was supposedly for everyone, including patrol officers, but for unknown reasons only SWAT and Narcotics have access to it.[134] Therefore, Thompson never did any similar decision-based courses with targets pop-up or other targets.[135]

Also, although HPD was aware of a review of NYPD Firearms Training, which acknowledged that many shootings occurred in poor lighting and recommended firearm mounted lights,[136] HPD policy was the complete opposite and specifically prohibited weapon mounted lights.[137] However, there was a mandatory low-light course started in 2011 in response to a perceived need for additional low-light training since HPD "hadn't had one in a while."[138]

c. The Chief Was Aware of, But Chose to Ignore, Prior Shootings Revealing a Need for Additional Training

"To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'" *Estate of Davis ex rel. McCully v. City of N. Richland Hills,*

---

[130] Bratton Depo at 12:22–13:23; 51:7–18, Ex. 4
[131] Lambert Depo at 30:7-25, Ex. 5; Bratton Depo at 137:17-138:2, Ex. 4
[132] Lambert Depo at 35:13-36:14, Ex. 5; Sweatt Depo at 70:22-72:5, Ex. 3; Vashaw Depo at 16:23-17:21, Ex. 6
[133] Lambert Depo at 26:15-37:16, Ex. 5
[134] Bratton Depo at 73:10-74:14, Ex. 4; Howse report at 24-25, Ex. 34
[135] Thompson Depo at 64:2-5, Ex. 2
[136] NYPD 2008 RAND report, Ex. 23
[137] General Order 400-05, Ex. 24
[138] Provost Depo at 56:13–25, Ex. 9

406 F.3d 375 (5th Cir.2005) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)). Therefore, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a municipality might reasonably be found to be deliberately indifferent. *City of Canton*, 489 U.S. at 390; *see also Snyder*, 142 F.3d at 798. Here, there is a pattern of shootings by HPD officers of which the Chief had either actual knowledge from the IAD reports, or should have known about had he properly fulfilled his duties. *Webster*, 735 F.2d at 842 (en banc) ("[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities . . .")

Pursuant to HPD policy, the Chief of Police is in charge of deciding what training was, and was not, provided to rank and file patrol officers.[139] The Chief was also on notice that use-of-force encounters with citizens were part of day-to-day police work, as evidenced by his receipt of numerous IAD investigations relating to the use of force by officers, particularly in regards to shootings of citizens. All completed IAD investigations are addressed directly to the Chief of Police, which pursuant to HPD policy, meant that the Chief actually received the reports.[140] In addition to receiving the entire IAD investigation file, the Chief also receives "noteworthy event reports" and "significant event reports" to keep him informed of what's going on with HPD officers.[141] *See Escobar v. City of Houston,* No. 04–1945, 2007 WL 2900581, at *38 (S.D. Tex. Sept. 29, 2007). At the executive level, HPD also receives news clips and materials from organizations such as IACP and PERF, and their Media Relations section monitors the media.[142]

---

[139] Provost Depo at 48:25–49:7; 195:4–14, Ex. 9
[140] Provost Depo at 149:16–150:18; 107:12–109:12; 195:17–196:12, Ex. 9; General Order 200-08, Ex. 32
[141] Provost Depo at 112:4–23; 178:13–179:18, Ex. 9
[142] Provost Depo at 113:10–115:2; 198:16–199:10, Ex. 9

In his report, Howse identifies at least 46 shootings that were unreasonable and not justified, most involving unarmed suspects.[143] Analysis of these shootings reveals a pattern of HPD officers shooting at least 10 unarmed citizens per year from 2007 to 2009, the three years before this shooting, and they were quickly approaching that number in 2010.[144] A common theme is that the involved officers state a generalized "belief" that the suspect may have had a weapon, with no actual observations to support that belief, or that the suspect was reaching for his waistband.[145] As this Honorable Court explained in its *Escobar* opinion:

> **The relevant comparison is not with the number of times an HPD officer gets through a day without accidentally discharging his or her weapon at or in close proximity to other people, including those in physical encounters.** Rather, the issue is whether the number and nature of incidents reveals a pattern showing deficient training that is "obvious and obviously likely to result in a constitutional violation." *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (citations and quotations omitted). The evidence of twenty-six similar incidents of accidental discharges in five years, coupled with the various inquiries, memos, and letters about HPD's weapons and use-of-force training, the inconsistent evidence as to what training HPD in fact provided on indexing and related techniques, and the obviousness of the risk created if officers are not trained on indexing, raises fact issues that preclude summary judgment. The fact issues include whether the City's policymakers were deliberately indifferent to the rights of its citizens. Chief Bradford was responsible for approving HPD's training program and received notice from several concerned sources—within HPD and from the community—before Escobar's death about the department's use-of-force training. **The pattern evidence of similar gun discharges in close-quarter struggles between officers and citizens gives rise to a fact issue as to whether HPD's handgun training was "obviously likely to result in a constitutional violation."** *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).

*Escobar v. City of Houston,* No. 04–1945, 2007 WL 2900581, at *40 (S.D. Tex. Sept. 29, 2007)

(emphasis added).

As in *Escobar*, the pattern of HPD officers discharging their weapons at suspects who were unarmed and posed no immediate threat to the officer are presented here, not to show the existence of a custom or practice, but rather to "show the City's knowledge of the need for

---

[143] Howse report at Addendum II, Ex. 34; IAD prior shootings, Ex. 25
[144] Howse report at Addendum I, Ex. 34. There were at least 9 more citizen injuries or deaths in 2010. IAD discharges, Ex. 26
[145] Howse report at 16, Ex. 34

additional training" in the area of situational "shoot, don't shoot." *See Escobar,* 2007 WL 2900581, at *40. In addition, many of these shootings occurred at night, where reduced lighting affected the officer's ability to see the suspect's hands.[146] These cases identified by Howse, are what he describes as "perception shootings," where an officer simply thinks a suspect has a weapon.[147]

Perhaps more shocking is that IAD files are reviewed by multiple people as they pass up the chain of command,[148] but for unknown reasons, it appears no one along the chain ever considered or addressed such obvious issues as "[w]hy so many unarmed men would rummage in their pants at a moment of crisis."[149] Therefore, the problem is not that the Chief was unaware of the numerous improper shootings, but rather that he simply chose to ignore the opportunity for increased training, especially when many shootings could have been avoided had officers had sufficient and repeated decisional training engrained.[150] The failure by anyone, on any level, to step back and ask questions or recognize such "obvious and questionable trends" constitutes deliberate indifference.[151]

As more direct proof of HPD's knowledge, HPD's Chief decided to form a Shooting Review Committee in early 2008 for the purpose of "look[ing] at [shootings] to see if we can gain any valuable information, say, through tactics, training and maybe like policy modifications if needed."[152] Thus, on May 13, 2008, over two years prior to this shooting, an executive staff meeting was held, to discuss the SRC, with the Chief and other staff in attendance.[153] During that meeting, there were discussions about officer-involved shootings, and based on that discussion

---

[146] Howse report at Addendum I, Ex. 34; IAD prior shootings, Ex. 25
[147] Howse Depo at 82:4-83:3, Ex. 11
[148] Provost Depo at 29:12–32:21; 67:25–74:22, Ex. 9; Class I routing, Ex. 27
[149] Howse report at pg. 6 of Attachment M, Ex. 34
[150] Howse report at 29-30, Ex. XX
[151] Howse report at 17-18, Ex. XX
[152] Buenik Depo at 36:24–37:16, Ex. 10; Also, it is questionable how effective the committee could be when it specifically since they chose not to review cases that might actually reveal a lack of training. Shooting Review Committee, Ex. 28
[153] Buenik Depo at 39:2–40:3, Ex. 10

Buenik made a notation: "ask officer -> why did you do this? **80% of shootings could have been avoided.**"[154] Thus, there was an obvious and perceived need for additional or different training well before this shooting occurred. Furthermore, HPD's Chief received notice of additional shootings identified by Roger Clark, an expert in another case, barely a year prior to this shooting.[155] Importantly, that report specifically included criticism of HPD's simulated/scenario-based training.

HPD appears to be more concerned with its officers, simply having them see a counselor after a shooting, but requiring no additional or remedial training,[156] in stark contrast to NYPD, which requires all officers who discharge their firearms to attend a firearms-retraining course, "regardless of the circumstances of the discharge."[157]

> d. Despite these Previous Shootings, There Have Been No Significant Changes to HPD's Use of Force or Low-Light Training in the Last 10 Years

Supposedly, the Chief relies on IAD reports when making his decision as to what upcoming training should address.[158] Despite this knowledge of persistent issues by HPD's policymaker, as described above, there have been no significant changes to the use of force policy and firearms or low-light training since 2004, except for the one course added in 2010, and while Bratton identifies changes to training about "objective reasonableness," that change occurred in 2012, after this shooting.[159] In addition, although HPD should have been aware of need for additional nighttime training since at least 2004,[160] the mandatory low-light course was not added until 2011.

---

[154] Buenik Depo at 40:10–41:4, Ex. 10; SRC meeting notes, Ex. 29 (emphasis added)
[155] Roger Clark report, Ex. 30
[156] Thompson Depo at 167:10-20, Ex. 2; Bratton Depo at 96:10-97:2, Ex. 4
[157] Howse report at 16, Ex. 34
[158] Provost Depo at 53:20–54:17, Ex. 9
[159] Provost Depo at 57:3–11, Ex. 9; Lambert Depo at 38:23–39:2, Ex. 5; Bratton Depo at 118:23 – 119:12
[160] Howse report at 28, Ex. 34

The bottom line is that HPD provides extensive training on gun handling, how to shoot, and accuracy, effectively making their officers trained killing machines, so that when they fire their weapons, it is even more likely that they will hit their target.[161] However, despite this increased likelihood for serious injury and death to citizens, HPD's decisional or shoot/don't shoot is grossly inadequate. In other words, HPD has made the conscious decision to focus its training almost exclusively on accuracy, while ignoring the decisional aspect. This constitutes conscious and deliberate indifference to the safety and rights of the public.

Furthermore, there appears to be a disconnect between IAD and the training division; even when a shooting is found to be unjustified, IAD handles everything and does not ask for comments from training instructors.[162] Even when the trainers, such as Bratton, go out to the scene, they are mostly concerned with what the suspects were doing, not the officer's actions.[163] After that point, training is no longer involved, either during or after IAD investigation is completed.[164] At no point does he create any report nor even tell anyone his thoughts about any lack of training.[165] Instead, IAD handles everything, and does not ask for comments or recommendations about training.[166]

### 3. The Inadequate Policy Caused Salazar's Injuries

With regard to causation, liability can be imposed on the municipality if the failure to train is a "moving force" behind or "cause in fact" of the Constitutional violation. *See, e.g., Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see also, Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997). First, there is no dispute that Plaintiff's injuries are the direct result of being shot by Officer Thompson; he admits that he shot Salazar in the lower back,

---

[161] Howse report at 29-30, Ex. 34
[162] Bratton Depo at 97:15–98:10, Ex. 4
[163] Bratton Depo at 84:8–85:1; 98:11–21, Ex. 4
[164] Bratton Depo at 87:12–88:16, Ex. 4
[165] Bratton Depo at 85:14–19, Ex. 4
[166] Bratton Depo at 98:1–10, Ex. 4

and the bullet lodged in Plaintiff's spine, paralyzing him.[167] This decision to shoot was in reliance on the faulty training he had received;[168] as Thompson testified that he was taught it was basically the officer's discretion as to whether deadly force could be used against a suspect.

Also contrary to established law, HPD training instructs its officers on "totality of circumstances" as meaning they are to consider anything that *occurred prior* to using deadly force, using a "1+1+1=3 and you shoot at 3" approach,[169] but as discussed earlier case law is clear that the proper focus is on the "totality" at the time of shooting. Indeed, when asked what factors he considers before using deadly force, based on his training, Thompson listed vague factors like "Experience, what happened *prior*, information I received *prior* to arriving at a location, what I would expect from past experience a reasonable person would do when seeing someone in full uniform."[170]

Moreover, the shooting occurred in a low-light situation, and Thompson fired his weapon, despite never seeing anything whatsoever in Plaintiff's hands, simply because he "thought" Plaintiff might be reaching for a weapon. Howse describes this shooting as a classic "perception shooting," where an officer simply thinks a suspect has a weapon.[171] In fact, besides at the Academy, Thompson only had one other low-light training course, in 2011, after this shooting.[172] Moreover, HPD's training appears to specifically authorize "perception shootings."[173]

As in *Zuchel,* Officer Thompson simply did not behave as an adequately trained officer would behave, and in fact his training in when to shoot was inadequate. *See Zuchel,* 997 F.2d at

---

[167] Thompson Depo at 135:8–19, Ex. 2; Jackson Depo at 69:25–70:8, Ex. 7; Salazar Ben Taub records, Ex. 13
[168] Thompson Depo at 177:5–17, Ex. 2
[169] Thompson Depo at 73:7-14, Ex. 2; Bratton Depo at 35:8-36:6; 43:20-44:7; 103:13-18, Ex. 4; Provost Depo at 37:19-38:19, Ex. 9; Howse Depo at 172:8-173:22; 176:13–178:22, Ex. 11
[170] Thompson Depo at 73:7-16, Ex. 2
[171] Howse Depo at 81:4-83:3, Ex. 11
[172] Thompson Depo at 64:8-65:23, Ex. 2
[173] Thompson Depo at 71:8–72:7, Ex. 2

740. Most importantly, HPD focuses "probably 90%" of its firearm training on target practice, ensuring that its officers will strike their targets, but provides almost no training of *when* to actually shoot a target. Because of HPD's policy of inadequate situational, decision-based use of force and low-light training, Officer Thompson, when faced with an encounter with a suspect where he had to make a decision on the use of deadly force, failed to assess the situation and inappropriately discharged his weapon at Plaintiff, causing him to be paralyzed. According to Howse, Officer Thompson's inadequate training was a moving force behind Salazar's shooting.[174] Accordingly, there is evidence that HPD's policy of inadequate training was a direct cause and a moving force behind Salazar's shooting.

## D.   HPD IS LIABLE FOR THE FAILURE TO SUPERVISE AND DISCIPLINE ITS OFFICERS DESPITE A PATTERN OF SHOOTINGS OF UNARMED CITIZENS

HPD is also liable for its failure to supervise and discipline officers involved in prior shootings of unarmed suspects. *See Piotrowski v. City of Houston*, 237 F. 3d 567, 581 (5th Cir. 2001) ("Self-evidently, a City policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens.").

### 1.   HPD's Investigations of Officer Involved Shootings Were Inadequate and Consistently Found Shootings of Unarmed Suspect to be Justified

Municipal liability may be based upon "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 694. The Fifth Circuit has described the requirement:

> A pattern is tantamount to official policy when it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." Id. at 579 (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.1984) (en banc)). Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the

---

[174] Howse Depo at 147:21 – 149:12; 184:23 – 187:5; Howse report at 29-30, Ex. 34

attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." Webster, 735 F.2d at 842.

*Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009)

Moreover, a plaintiff is generally permitted to introduce a pattern of putative misconduct, regardless of the dispositions contained in the police file, since a material part of a *Monell* claim may properly be failure to discipline or otherwise address this misconduct. *See Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had any validity, the very assertion of a number of such claims put the city on notice that there was a possibility that its police officers had used excessive force.").

   a.   <u>HPD's IAD Investigations Contort the Evidence in Whatever Manner Necessary to Clear The Officers Involved</u>

According to Jackson, there is no checklist for an IAD investigation; instead, each sergeant simply decides what evidence he wants to gather.[175] Regardless of the evidence gathered, the investigation summary always tracks officers' version of events, routinely discrediting or disbelieving statements of non-officer witnesses.[176] As the DOJ commented in its NOPD report:[177]

> In the cases we reviewed, the analysis of evidence was often poor. We found instances where investigators used witnesses' statements to the extent they supported officers, but overlooked statements where they supported the complainant. We found that investigators often researched complainant backgrounds to determine credibility but did not document or appear to similarly consider officers' backgrounds. **Factual assertions by officers were often not probed, even where the facts asserted in interviews were not included in contemporaneous official documentation.**

As in New Orleans, HPD investigators failed to adequately probe or verify the claims of its officers; in this case, although Thompson's initial statement made no mention of Salazar turning his body, his statement over two months later inexplicably does.

---

[175] Jackson Depo at 19:8–19:25, Ex. 7
[176] Howse report at 14, Ex. 34; IAD prior shootings, Ex. 25
[177] Howse report at pg. 89-91 of Attachment F, Ex. 34

43

Perhaps more telling, since a September 14, 2007 incident that involved no injuries, each and every intentional shooting by a HPD officer has been ruled justified following an IAD investigation.[178]

| Year | Shootings at Citizens | Accidental | Not Justified | Justified | Not Sustained |
|------|----------------------|------------|---------------|-----------|---------------|
| 2006 | 38 | 1 | 2 | 35 | 0 |
| 2007 | 32 | 4 | 3 | 24 | 0 |
| 2008 | 32 | 3 | 0 | 28 | 0 |
| 2009 | 50 | 2 | 0 | 48 | 0 |
| 2010 | 36 | 2 | 0 | 34 | 0 |

Much like the DOJ found with the New Orleans police department, this statistic defies common sense.[179]

Even more incredible, there is actually a fifth option for a shooting investigation: "not sustained", which means that there exists "insufficient evidence exists to justify or not justify" the shooting.[180] Thus, you would expect to see it used where there was conflicting evidence, but Provost instead states that the default finding is actually justified.[181] in all of the IAD files produced by Defendants, this classification has never been used, even where there are clearly conflicting stories.[182]

In addition, the IAD investigators typically consider events that occurred well before the actual shooting, or even discovered afterwards. Per Bratton, not ok to shoot someone simply for holding a gun/knife,[183] but IAD finds lots of those situations justified.[184] Also, as noted above, HPD fails to recognize and acknowledge recurring patterns in IAD investigations.

---

[178] Interestingly, this final non-justified shooting occurred prior to the MSJ denial in *Escobar v. City of Houston*. Everything since has been justified.
[179] Howse report at 12, Ex. 34
[180] Provost Depo at 85:6–11, Ex. 9; Corrective Action Manual, Ex. 33
[181] Provost Depo at 80:7–82:11, Ex. 9
[182] IAD case # 27189-2006, 34178-2009, Ex. 25
[183] Bratton Depo at 117:2–13, Ex. 4

b.  Lack of In-Car Cameras

In light of studies that have concluded the presence of a camera sharply reduces the amount of excessive force incidents by officers, Howse also faults HPD for a lack of in-car cameras across its patrol fleet.[185] Although most other police departments in Texas have nearly all of their patrol cars equipped with cameras,[186] only a small percentage of HPD patrol cars have cameras.[187]

At the scene of a shooting, Homicide supposedly performs a "complete thorough investigation," which includes having the involved officer doing a walkthrough and explaining what happened, but only after having an opportunity to speak with his attorney.[188] Inexplicably, no one bothers to record the walkthrough, even when there is a video camera at the scene.[189]

c.  HPD Rarely Disciplines Its Officers, and Even When Officers Receive Punishment, It is More Often Than Not Overturned or Reduced on Appeal

According to a review of HPD records, only seven percent of complaints against officers resulted in discipline consisting of a three-day or longer suspension.[190] In fact, it appears HPD has the most honest officers anywhere; less than 25 officers, out of almost 5,500, are punished each year for being untruthful.[191] While no HPD officers have been punished in recent years for intentionally shooting a suspect, it is doubtful that any punishment would even stick. According to Provost, over half of the discipline is overturned on appeal,[192] an investigation by the Texas Observer found that two-thirds are overturned or reduced.[193]

---

[184] *See* Howse report at Addendum II, Ex. 34; IAD case # 29823-2007, 32633-2008, 37656-2010, 37894-2010, Ex. 25
[185] Howse report at 10-11, Ex. 34
[186] Howse Depo at 88:17-89:4; 90:9-96:2, Ex. 11; Howse report at 9, Ex. 34
[187] Thompson Depo at 84:21–85:16, Ex. 2; Provost Depo at 112:24–113:5, Ex. 9; Howse Depo at 86:19-87:4, Ex. 11
[188] Bratton Depo at 94:8–21, Ex. 4
[189] Bratton Depo at 94:22–95:9, Ex. 4
[190] Howse report at 18, Ex. 34
[191] Provost Depo at 120:12–121:6, Ex. 9
[192] Provost Depo at 134:2–135:25, Ex. 9
[193] Howse report at 18, Ex. 34

### 2. The Lack of Discipline for Such Shootings Provided an Aura of Immunity for HPD Officers, In Deliberate Indifference to the Rights of Citizens

As note supra, in Section C, apparently no one at HPD is responsible for tracking trends or the results of IAD investigations.[194] Homicide would simply keep a spreadsheet with date of shooting, whether anyone was killed or injured, what type of weapon was involved, and possibly a short description of what happened, but nothing about the outcome or any findings.[195] Also, the Administrative Discipline Committee in charge of discipline, but Chief makes final decision.[196]

Defendants' reliance on *Pineda* is misplaced. In *Pineda*, the Court held that a mere eleven instances of <u>unconstitutional warrantless searches</u> out of some 500 narcotic related offense reports (which were actually a subset of 5,000 offense reports) were insufficient to establish a custom of illegal searches. 291 F.3d 325, 329 (5th Cir. 2002). The Court also noted that, for each instance, the evidence was equivocal as to whether there had been a violation. In this case, Plaintiffs' expert notes that of the shootings he reviewed that resulted in the death or injury to a citizen, over 25% of each year's shootings involved an unarmed suspect.[197] In addition, while unclear in *Pineda*, the IAD reports presented by Plaintiffs here were routinely provided to the Chief, as a matter of policy.

Again, in light of the multi-layered review, it is simply inconceivable that no one at HPD noticed that every shooting since February 23, 2006 in which a citizen was injured or killed was found to be unjustified, despite there being **no change** in training. Additionally, the lack of cameras serves to further increase the aura of immunity at HPD, all the way to the top of the command chain. In fact, the Chief himself was recently involved in a car accident, and the

---

[194] Buenik Depo at 114:18–115:18, Ex. 10
[195] Buenik Depo at 107:11–108:15; 110:6–10, Ex. 10
[196] Jackson Depo at 40:6–16, Ex. 7: Provost Depo at 195:4–12, Ex. 9
[197] Howse report at Addendum I, Ex. 34

official HPD statement of events was quickly contradicted by surveillance video of the accident.[198]

### 3.  Moving Force/Causation

As Howse explained in his deposition, the lack of any discipline after a shooting has a definite effect on patrol officers.[199] When an officer knows that other people he works with have been involved in a shooting, regardless of the circumstances, and it is always found to be justified,[200] In addition to ruling every shooting justified, HPD explicitly allowed officers to do "whatever it takes to get home tonight" and failed to instruct its officers when it's ok to shoot or not.[201] Additionally, Thompson had animal shootings prior to paralyzing Salazar.[202] As with every other animal shooting by HPD officers, both of those were also ruled justified.[203]

Further adding to the aura of immunity, Thompson also confirms that HPD officers follow the "code of silence" or "blue wall of silence."[204] During his six year career, he is not aware of any officer who has ever filed an actual complaint on another officer.[205] In fact, he has never filed a complaint despite witnessing illegal conduct by other officers.[206]

### E.   HPD RATIFIED THE UNCONSTITUTIONAL CONDUCT OF OFFICER THOMPSON

Support for ratification as a theory of § 1983 liability can be found in a number of decisions. In the leading case of *City of St. Louis v. Praprotnik* a plurality of the Supreme Court reasoned:

> "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers

---

[198] Provost Depo at 119:5–120:11, Ex. 9; Howse report at 10, Ex. 34
[199] Howse Depo at 69:5–25, Ex. 11
[200] Howse Depo at 143:6–145:22, Ex. 11
[201] Thompson Depo at 170:4–17; 51:7–18, Ex. 2
[202] Thompson Depo at 76:12-78:14, Ex. 2
[203] Thompson complaint history, Ex. 31; Thompson Depo at 76:12-78:14, Ex. 2; Howse report at 16, Ex. 34
[204] Thompson Depo at 170:18-171:1, Ex. 2
[205] Thompson Depo at 171:2-15, Ex. 2
[206] Thompson Depo at 172:2-15, Ex. 2

> approve a subordinate's decision and the basis for it, their ratification would be
> chargeable to the municipality because their decision is final."

485 U.S. 112, 127 (1988).

The Fifth Circuit has since adopted ratification in section 1983 cases. *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (recognizing ratification as a theory of liability but limiting it to "extreme factual situations"). This case presents such a situation, as the IAD investigation here reached the exact opposite conclusion of a prior investigation with many similar facts.

After the shooting of Eli Escobar, back in 2003, HPD conducted an IAD investigation into the shooting. The situation began when officers responded to an assault call and encountered Escobar and some other juveniles. According to HPD's own investigation, (12696) the officer attempted to detain Escobar, but Escobar physically resisted and broke away while yelling loudly at the officer. As the officers continued their attempts to gain control, Escobar was trying to reach into his waistband or pants pocket and at one point kicked the officer in the groin. The officers never saw Escobar with a weapon, nor was one found afterwards. Even in light of these facts, the investigation concluded:

> However, **the mere fact that he, [Escobar] may have been trying to place his hand or hands in his pants pocket did not justify Officer Carbonneau's decision to unholster and draw his duty weapon,** especially when in close proximity to his partner and a struggling suspect. Officer Carbonneau also contends that he drew his duty weapon because [Escobar] kicked him in the testicles and he was about to "collapse." It should be noted that there are witnesses that refute this contention as well, and state that Officer Carbonneau was not kicked in the groin area. However, **even if Officer Carbonneau had been kicked in the testicles, to the point of incapacitation, as he contends, this still would not have warranted the use of deadly force.**

While the facts in the Escobar case are factually similar to the facts presented here, where the officer attempts to justify the use of deadly force based on a struggle and the officer's assertion that a suspect may have reached for his pants pockets and/or waistband, the outcome of the IAD

investigations in Escobar and this case could not be more inapposite. While HPD's use of force policies have not changed in any significant manner, the outcome of the department's IAD investigations have become justified 100% of the time. Somehow, despite no significant changes in the use of force policy b/w the two incidents, the same conduct that violated policy in Escobar somehow was not a violation in this case. In addition, the IAD investigation failed to acknowledge, or otherwise resolve, the discrepancies between Thompson's statements, especially the addition of the "turn" by Salazar, and the medical records of the bullet wound.

## F.   PLAINTIFFS ARE ENTITLED TO EXEMPLARY DAMAGES FROM THE INDIVIDUAL DEFENDANTS FOR THEIR SECTION 1983 CLAIMS

Plaintiffs do not seek exemplary damages under the TTCA; rather, they are sought pursuant to their section 1983 claims and are available against state or local officials in their individual capacities. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

### CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiffs pray that Defendants' Motion for Summary Judgment be denied in its entirety, and for all other relief to which they are justly entitled.

WHEREFORE, premises considered, Plaintiffs respectfully requests that this Court DENY the Defendants' Motion for Summary Judgment as well as for any and all such further relief to which Plaintiffs show themselves justly entitled.

Respectfully submitted,

**TALABI & ASSOCIATES, P.C.**


By:      /s/ Sean Palavan
       Sean M. Palavan
       Texas Bar No. 24058640
       spalavan@talabilawfirm.com
       Mehran "Mike" Talabi
       Texas Bar No. 24037579
       2909 Hillcroft Ave., Suite 200
       Houston, Texas 77057
       Tel: (713) 266-0529
       Fax: (713) 266-2203
       Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Plaintiffs' Response to Motion for Summary Judgment was served by facsimile upon Deidra A. Norris, Attorney for Defendants, P.O. Box 368, Houston, Texas 77001, this 9th day of May, 2014.

/s/ Sean Palavan
Sean Palavan