**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| RICARDO SALAZAR-LIMON, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 12-3392 |
| | § | |
| CITY OF HOUSTON *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

A Houston Police Department officer shot a man after he was pulled over late at night on a busy freeway for suspected drunk driving. When the officer tried to handcuff the man, the man resisted. After a brief struggle — the details of which are disputed — the man walked away from the officer and headed back to his truck. The officer pulled out his weapon and twice ordered the man to stop and raise his hands, but the man did not obey. Instead, the man turned toward the officer, reaching toward his waistband. The officer fired once, hitting the man in the lower right back. The man is partially paralyzed as a result. This civil-rights action against the officer and the City of Houston, alleging constitutional violations and state-law tort claims, followed.[1]

The officer and the City of Houston have moved for summary judgment. (Docket Entry No. 31). They argue that qualified immunity precludes finding the officer liable and that limits on municipal liability preclude finding the City liable. The defendants also argue that they cannot be held liable on the state-law causes of action. The plaintiffs responded, the defendants replied, and counsel presented argument. (Docket Entry Nos. 38, 44). Based on the record; the motion,

---

[1] The plaintiffs initially sued supervisory officers as well, but they have been dismissed.

1

response, and reply; counsels' arguments; and the applicable law, the court grants the motion for summary judgment and enters final judgment by separate order.

The reasons for this ruling are explained below.

## I.     Background

Around midnight on October 29, 2010, Ricardo Salazar-Limon was driving his truck on Houston's Southwest Freeway.  Three other men were in the truck.  (Docket Entry No. 38, Ex. B, Salazar Depo. at pp. 13–15).  Salazar had consumed four or five beers in the previous two hours and had the rest of the 12-pack with him in the truck.

HPD Officer Chris Thompson was operating a LIDAR speed gun on the Southwest Freeway that night.  Thompson recorded Salazar's speed as over the limit and saw that he was weaving between lanes.  (Docket Entry No. 31, Ex. A, Thompson Depo. at pp. 89–90).  Thompson turned on his lights and sirens and followed Salazar's truck.  A minute later, Salazar pulled over and stopped on the right shoulder of an elevated overpass, next to a low retaining wall.  (*Id.* at p. 96; Salazar Depo. at p. 19).  About two feet separated the freeway wall from the passenger side of Salazar's truck.  (Salazar Depo. at p. 27).  Thompson parked his patrol car about four feet behind the truck. (*Id.* at p. 25; Thompson Depo. at p. 97).  Before getting out of the patrol car, Thompson ran a search on Salazar's license plates to see if the truck was stolen; it was not.  (Thompson Depo. at pp. 97–98).

Thompson walked over to the driver's window of the truck and asked Salazar for his license and proof of insurance.  (*Id.* at p. 98; Salazar Depo. at pp. 19–20).  Salazar gave Thompson his Mexican driver's license.  (Thompson Depo at p. 99; Salazar Depo. at p. 20).  When Salazar tried to ask a question, Thompson told him to be quiet and "calm down."  (Salazar Depo. at p. 21). Thompson returned to his patrol car and checked the driver's license.  (*Id.* at p. 22; Thompson Depo.

2

at p. 99).  The check showed that there were no open warrants or charges pending against Salazar.

Thompson returned to the driver's window and asked Salazar to get out of his truck.  (*Id.* at p. 23, Thompson Depo. at p. 101).  Salazar stepped out of the truck and stood next to Thompson, between the truck and the patrol car.  (Salazar Depo. at p. 23; Thompson Depo. at p. 101). Thompson pulled out handcuffs and told Salazar that he was detained on suspicion of drunk driving. (Thompson Depo. at pp. 104, 106–07).  Salazar asserts that Thompson pulled out handcuffs and said that he was arresting Salazar and would take him to jail.  (Docket Entry No. 38 at pp. 4, 6; Salazar Depo. at p. 25)  Thompson tried to handcuff Salazar's right hand, but Salazar pulled away.  (Salazar Depo. at p. 24).  A brief struggle followed.  (Docket Entry No. 13 at ¶ 23).  The parties dispute the extent of that struggle.  Thompson testified that Salazar pushed him toward the lanes of oncoming traffic, then, continuing to resist, pushed him against the low retaining wall at the edge of the elevated overpass.  (Thompson Depo. at pp. 177–78).  Thompson was afraid that Salazar would push him over the freeway wall onto the road below.  (*Id.* at p. 178).

Salazar testified that he did not struggle with Thompson at any point.  (Salazar Depo. at pp. 26–27).  But Salazar alleged in his complaint that he did have a "brief struggle" with Thompson after the handcuffs came out.  (Docket Entry No. 13 at ¶ 23).  Salazar also later pleaded *nolo contendere* to a charge of resisting arrest.  The charging instrument alleged that Salazar resisted arrest by pushing Thompson.  (Docket Entry No. 44, Ex. I, Charging Instrument, Cause No. 1716652; Ex. J, *Nolo Contendere* Plea to Cause No. 1716652).

Although the parties dispute the details of the struggle, they do not dispute that Thompson attempted to detain and handcuff Salazar and that Salazar resisted.  Neither party was injured during that struggle.  (Docket Entry No. 38, Ex. 17).  The parties also agree that after the brief struggle,

Salazar pulled away, turned his back to Thompson, and walked along the freeway retaining wall back toward the passenger door of his truck.  (Salazar Depo. at pp. 26, 40; Thompson Depo. at p. 113).   Thompson pulled out his weapon when Salazar walked away and ordered him to stop. (Thompson Depo. at pp. 113–115).   When Salazar kept walking, Thompson repeated the order to stop and added an order for Salazar to raise his hands.  (*Id.*).   Salazar did not comply.  Instead, he walked forward another few steps.  (Salazar Depo. at pp. 28–29).

Salazar was wearing an untucked shirt that hung below his waist.  (*Id.* at p. 36–37). Thompson testified that he saw Salazar turn to his left and reach toward his waist.  (Thompson Depo. at pp. 115–18).   Thompson testified that Salazar's motion was consistent with a suspect retrieving a weapon from his waistband.  (*Id.*).   Less than a minute after the first order to stop, Thompson fired a single shot, hitting Salazar in the right lower back.  (Salazar Depo. at pp. 29, 31). Salazar testified that he turned and saw Thompson after the shooting.  (*Id.* at pp. 27–29).   Salazar was not armed.

The medical evidence showed that the bullet entered Salazar's right side and lodged in his spine, suggesting that Salazar was turning to the right when he was shot.  (Docket Entry No. 38, Ex. 8, Allen Depo. at pp. 72–74; Ex. 13, Salazar Ben Taub Records at 33).   The gunshot wound left Salazar partially paralyzed.

Salazar was charged with, and pleaded *nolo contendere* to, resisting arresting and driving while intoxicated.  (Docket Entry No. 44, Exs. I, J, K, L).   In October 2012, Salazar and his wife filed this suit in state court individually and on behalf of their children.  They sued Thompson, the City of Houston, and various Houston Police Department officials, alleging constitutional and state-law violations.  (Docket Entry Nos. 1, 13).   The defendants timely removed.  (Docket Entry No. 1).

4

The plaintiffs have dismissed their claims against the Houston Police Department officials. The claims against Thompson and the City of Houston remain. (*See* Docket Entry No. 46).

The defendants' grounds for seeking summary judgment, and the plaintiffs' responses, are analyzed below.

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive

5

a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.     The Claims Against Thompson in his Individual Capacity

### A.     The Legal Standard for Qualified Immunity

Section 1983 provides a cause of action against an individual who, acting under color of state law, has deprived a person of a federally protected statutory or constitutional right.  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "In reviewing a motion for summary judgment based on qualified immunity, [courts] undertake a two-step analysis."  *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014).  "First, [courts] ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right."  *Id.* (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014)).  "Second, [courts] ask 'whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)).  "A court has discretion to decide which prong to consider first."  *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently." *Luna*, 773 F.3d at 718.  But "[a]s the Supreme Court has recently reaffirmed, 'in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (quoting *Tolan*, 134 S. Ct. at 1863).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009) (quotations omitted).

As the en banc Fifth Circuit recently held:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that "every 'reasonable official would understand that what he is doing violates [the law].'"  To answer that question in the affirmative, we must be able to point to controlling authority — or a "robust 'consensus of persuasive authority'" — that defines the contours of the right in question with a high degree of particularity.

*Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083, 2084 (2011) (alteration in original, internal footnotes omitted)).

"Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 233 (2009).  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted).  "[W]hile the Supreme Court has stated that 'courts

7

should define the 'clearly established' right at issue on the basis of the 'specific context of the case,'
it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in
a manner that imports genuinely disputed factual propositions.'" *Luna*, 773 F.3d at 724–25 (quoting
*Tolan*, 134 S. Ct. at 1866).  A plaintiff has the burden of overcoming the qualified immunity defense.
*Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989).

### B.    The Fourth Amendment Claims

Salazar admits that Thompson had probable cause to stop him and to handcuff and arrest him
for driving while intoxicated.  (Docket Entry No. 38 at p. 6; Salazar Depo. at pp. 35, 40; Howse
Depo. at pp. 74–76).  The issue is whether Thompson used excessive force when he shot Salazar,
that is, whether, considering all the circumstances, it was objectively reasonable for Thompson to
shoot.

To establish a claim of excessive force under the Fourth Amendment, a plaintiff demonstrate:
"(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive,
and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d
624, 628 (5th Cir. 2012) (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009))
The reasonableness inquiry "requires analyzing the totality of the circumstances." *Plumhoff v.
Rickard*, 134 S. Ct. 2012, 2020 (2014).

"[W]hether the force used is 'excessive' or 'unreasonable' depends on 'the facts and
circumstances of each particular case.'" *See Tolan*, 134 S. Ct. at 1863 ((quoting *Graham v. Connor*,
490 U.S. 386, 396 (1989)).  "Factors to consider include 'the severity of the crime at issue, whether
the suspect poses an immediate threat to the safety of the officers or others, and whether he is
actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at

8

396).  As the Supreme Court stated in *Graham*, "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395.  The determination of "reasonableness" under the Fourth Amendment is "not capable of precise definition or mechanical application . . . [but] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (internal quotation omitted).  The Court explained that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397.

Excessive-force determinations do not involve "easy-to-apply legal test[s]." *Scott v. Harris*, 550 U.S. 372, 383–84 (2007).  It is clear that a court may not apply hindsight to second-guess an officer's conduct.  *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (citing *Graham*, 490 U.S. at 396–97).  A court must consider only the information available to the officer at the time. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Connor*, 490 U.S. at 396.  A court must also recognize that officers often must make split-second decisions in stressful situations.  *Id.*

An officer's use of force is presumed to be reasonable when the officer "has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros*, 564 F.3d at 382 (citing *Mace v. City of Palestine*, 33 F.3d 621, 623 (5th Cir. 2003)); *accord Davis v. Romer*, No.

13-11242, 2015 WL 409862 (5th Cir. Feb. 2, 2015). "The excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) (quoting *Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001) (emphasis in original)). The Fifth Circuit's opinion in *Lytle*, 560 F.3d at 413, provides some clarity. The suspect there had led the officer on a car chase that threatened innocent bystanders. The officer reasonably believed that the suspect was armed, was driving a stolen vehicle, and had committed the felony offense of fleeing from a police officer. When the shooting occurred, the chase had ended and the suspect was driving away from the officer and was "three or four houses down the block." *Id.* at 409. There were no bystanders in the vehicle's path, and neither the vehicle nor its occupants posed a threat to the officer or others. *Id.* at 413. Because there were disputed facts material to determining whether the officer had "sufficient time to perceive that any threat to him had passed by the time he fired" while the suspect was driving away, the Fifth Circuit held that it did not have jurisdiction to consider the district court's denial of summary judgment to the officer on the basis of qualified immunity.

The summary judgment evidence here shows that Salazar had been drinking when Thompson pulled him over for speeding and weaving across traffic lanes. Salazar later pleaded guilty to a charge of driving while intoxicated that night. (Docket Entry No. 44, Exs. K, L). Thompson had checked Salazar's driver's license and license plates and knew that there were no open warrants or charges against him. (Thompson Depo. at pp. 97–98). But Thompson had not checked Salazar or his truck for weapons. Nor had Thompson checked the other three men in Salazar's truck for outstanding warrants, charges, or weapons. (*Id.* at p. 114; Salazar Depo. at p. 32).

When Thompson detained Salazar for drunk driving and tried to handcuff him, Salazar pulled

10

his arm away.  (Thompson Depo. at pp. 97, 113; Salazar Depo. at p. 26).  Some form of struggle ensued, although the details are disputed.  Based on the allegations in Salazar's amended complaint and his plea of *nolo contendere* to the State charge of resisting arrest, it is undisputed that there was a brief struggle, during which Salazar pushed Thompson.  (Docket Entry No. 38, Exs. I, J; Docket Entry No. 13 at ¶ 23; Thompson Depo. at pp. 177–78).

After that brief struggle, it is undisputed that Salazar broke away from Thompson and walked toward his truck.  (Thompson Depo. at p. 113).  Thompson pulled out his weapon and ordered Salazar to stop.  Thompson repeated that order, adding a command for Salazar to raise his hands. (*Id.* at pp. 113–15).  Salazar, who was still only feet away from Thompson, did not stop or raise his hands.  (Salazar Depo. at pp. 27–29).  Instead, he continued walking another few steps away from Thompson.  (*Id.*).

It was dark, other than the usual freeway overpass lights.  (Docket Entry No. 38, Ex. 14). Salazar was wearing a long shirt that covered his waistband.  (Salazar Depo. at pp. 36–37). Thompson testified that Salazar stopped walking and starting turning back toward Thompson, reaching toward his waistband. (Thompson Depo. at pp. 115–16).  Salazar offered no controverting evidence.  Thompson, as well as Salazar's expert witness, testified that police officers know that the waistband is a common place to hide a weapon.  (*Id.*; Howse Depo. at p. 115).  Thompson testified that the motion Salazar made was consistent with drawing a weapon.  (Thompson Depo. at pp. 117–18).  Thompson did not see any weapon.

Thompson fired a single shot, hitting Salazar in the lower right part of his back.  (*Id.* at pp. 114–15; Salazar Depo. at pp. 27–29).  The medical evidence and the testimony of Timothy Allen, a lieutenant in Internal Affairs at the Houston Police Department, showed that, based on the entry

wound, Salazar was turning to the right and toward Thompson when he was shot.  (Docket Entry No. 38, Ex. 8, Allen Depo. at pp. 72–73; Ex. 13, Salazar Ben Taub Records at p. 33)

Salazar argues that there was no reasonable basis to use deadly force because any threat he posed had ended by the time Thompson fired his gun.  But uncontroverted record evidence shows that Salazar had disregarded repeated orders, walked away, then turned back toward Thomson and reached for his waistband before Thompson fired.  That evidence distinguishes this case from those in which courts found that there was enough time between the suspect's threatening conduct and the officer's decision to shoot for the officer to see that the justification for using deadly force had ended.  *Cf. Lytle*, 560 F.3d at 413; *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated.").  Thompson's use of force was not justified by the earlier struggle with Salazar, the extent of which is disputed.  At the summary judgment stage, the court is required to resolve these disputes in Salazar's favor and assume that the struggle was limited.  Neither party argues that such a limited struggle would authorize the use of deadly force.  Even if it could, that brief struggle had ended and Salazar had begun to walk away from the officer before the shooting.

Thompson's use of deadly force was justified, however, by the officer's reasonable belief that Salazar was reaching for a weapon and turning to shoot him.  The undisputed summary judgment evidence shows that: Thompson had not checked Salazar for weapons; Salazar appeared intoxicated; Salazar did not obey repeated orders to stop and an order to show his hands; and that, as he walked away from Officer Thompson toward his own truck, he reached toward his waistband

and began to turn back toward the officer.[2] The summary judgment evidence also showed that it was dark,[3] that Salazar wore a shirt covering his waist area, and that Thompson did not have a direct view of the front of Salazar's body.

Before firing at Salazar, Thompson had twice ordered Salazar to stop and once ordered him to show his hands.  Thompson did not expressly warn Salazar that he would shoot if Salazar did not obey Thompson's orders.   But Thompson's conduct and words clearly communicated that "escalation of the situation would result in the use of the firearm." *Loch v. City of Litchfield*, 689 F.3d 961 (8th Cir. 2012) (quoting *Estate of Morgan v. Cook*, 686 F.3d 494, 498 (8th Cir. 2012)); *see Graham*, 490 U.S. at 396–97 (stating that officers should, when possible, warn suspects before using deadly force).

Thompson's belief that Salazar was armed turned out to be wrong, but it was objectively reasonable.  The undisputed facts show the type of "tense, uncertain, and rapidly evolving" situation requiring "split-second judgments" that courts are hesitant to second-guess with the benefit of hindsight. *Graham*, 490 U.S. at 396–97.  A reasonable officer in the circumstances Thompson faced could have believed, based on the facts that Salazar struggled with Thompson to resist detention and handcuffing, walked away from Thompson toward his truck, refused to obey repeated commands to stop, and then turned toward the officer, moving his hand toward his waistband, that Salazar posed an immediate threat to Thompson's safety.

---

[2]  Salazar argues that a reasonable jury might not credit Thompson's testimony that Salazar turned to his left as he reached for his waistband because medical evidence showed that Salazar turned to the right.  But it is undisputed that Salazar was turning back toward Thompson when he was shot.  This factual dispute does not preclude summary judgment.

[3]  Salazar argues that there is a factual dispute as to whether the lighting was so dim that Thompson could not have seen Salazar's hands.  (Docket Entry No. 38 at p. 11).  This dispute does not preclude summary judgment.  It is undisputed that, due to the angle of Salazar's body and Salazar's long shirt, Thompson did not have a clear view of Salazar's waistband or what Salazar reached for.

Salazar argues that because Thompson did not actually see a weapon in Salazar's hand or waistband, the use of force was not justified.  Keith Howse, Salazar's designated expert witness and the former Director of Public Safety and Assistant Chief of Police for the Baylor Health Care System in Dallas, testified in his deposition that Thompson should have waited until he actually saw Salazar with a gun before shooting.  (Docket Entry No. 44, Ex. C, Howse Depo. at pp. 118–19).   Howse also testified that Thompson should have used nondeadly force, such as a baton or a taser. (Docket Entry No. 44, Ex. C-1, Howse Report at pp. 8, 32–34).[4]  Neither the record nor the case law supports these arguments.

As noted, the record shows that when Thompson saw Salazar turn toward him, he was reaching toward his waistband, which was covered by a long shirt.  An officer in that circumstance, given Salazar's drunkenness and resistance to the officer's efforts to detain or arrest and handcuff him, his disregard for the officer's orders to stop, and his turn toward the officer while moving his hand toward his waistband, would reasonably have feared that the suspect was armed and would shoot.  Salazar had been walking away from Thompson, making the use of a baton difficult.  Given the time it would take to draw and charge a taser, Thompson did not act unreasonably when he believed that Salazar was pulling out a gun.

The Fifth Circuit has repeatedly "upheld the use of deadly force where a suspect moved out of the officer's line of sight and could have reasonably been interpreted as reaching for a weapon." *Ontiveros*, 564 F.3d at 385 (citing *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991)); *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985); *cf. Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012) (finding that the officers used excessive force by using a taser and a nightstick on the suspect and

---

[4]   Howse also testified Thompson would have been justified in using deadly force if, during the struggle, Salazar had pushed him toward oncoming cars or against the low freeway retaining wall.  (Howse Depo. at pp. 99–101; Howse Report at p. 6).

14

noting that the suspect was pulled over for a "mere traffic violation," did not resist arrest, did not reach for his waistband, and "was never given any commands that he disobeyed"). These cases undermine Salazar's argument that Thompson acted unreasonably by shooting before he saw Salazar holding a weapon.

In *Ontiveros*, 564 F.3d at 379, the police had received a call warning them that the plaintiff, Ontiveros, had fought with two men, threatened to kill them, and then showed up at their house with a gun. The police went to Ontiveros's home and found him behind a blocked door. An officer told him several times to raise his hands. Ontiveros then reached into a boot on the floor. *Id.* at 381. The officer fired two shots, killing Ontiveros. *Id.* The Fifth Circuit found that a reasonable officer could have believed Ontiveros was reaching for a weapon and interpreted the movement as an immediate threat to the officer's safety. *Id.* at p. 384. The court concluded that the officer who shot Ontiveros did not violate his constitutional rights.

In *Young*, 775 F.2d at 1349, the officer stopped a suspect after seeing him in a drug sale. The suspect did not follow the officer's instructions to get out of his car. Instead, the suspect reached down to the floor of his car. The officer, believing that the suspect was reaching for a weapon, shot and killed him. The Fifth Circuit held that the facts showed no constitutional violation because the officer "fired his gun in self-defense when he thought his own life was threatened." *Id.* at 1352.

In *Reese*, 926 F.2d at 494, the undisputed summary judgment evidence showed that the officer had stopped a vehicle with four occupants and repeatedly ordered them to raise their hands and keep them in the air. One of the occupants lowered his hands and reached for something on the car's floor. The officer testified that he believed the man was reaching for a gun. The officer shot and killed the man. It turned out that the man was unarmed. His mother, who sued officers alleging

15

unconstitutionally excessive force, did not controvert the evidence that he disobeyed repeated orders to keep his hands in the air and instead had reached for something on the floor of the car.  The Fifth Circuit held that the officer's use of deadly force in that situation was justified and did not violate the decedent's constitutional rights.[5]

Salazar relies on a number of cases in which the Fifth Circuit held that summary judgment in an officer's favor was improper despite the officer's testimony that he believed that the suspect was reaching for a weapon.  These cases are distinguishable.  In those cases, the officer's testimony that the suspect appeared to reach for a weapon was contradicted by competent summary judgment testimony from the suspect or from other witnesses.  *See, e.g.*, *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) ("Whether Putnal ordered Baker, Jr., to 'freeze' or to drop the pistol before Baker, Jr., turned toward him and whether Baker, Jr., was even holding the pistol or pointing it at Putnal are certainly issues of fact material to whether Putnal's actions were excessive and objectively reasonable."); *Sanchez*, 376 Fed. App'x at 452 (although the officer testified that the suspect "was digging in his waistband and pointing his hands under his shirt as though aiming a weapon," an

---

[5]     Other circuits have reached similar results.  *See Lamont v. New Jersey*, 637 F.3d 117 (3d Cir. 2011) (a suspected car thief had concealed his hand in his waistband and appeared to be clutching a weapon; after police ordered him to stop and raise his hands, the suspect pulled his hand out of his waistband as if he were drawing a gun); *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) (the officer, warned that a mall patron was armed, stopped a suspect who was drinking while walking around the mall; the suspect raised his hands at the officer's order but then lowered one hand to reach into his back pocket, where it turned out he had a radio, not a gun, but the the officer's use of force was not objectively unreasonable); *Pollard v. City of Columbus, Ohio*, No. 13-4142, — F.3d —, 2015 WL 925887 (6th Cir. March 5, 2015) (police officers in a car chase with a suspect they reasonably but erroneously believed to have a concealed-carry gun permit stopped the man and ordered him to show his hands; when he instead reached to the floor of the car, extended his arms, clasped his empty hands in a shooting posture, and pointed at the officers, the police were justified in shooting); *Loch*, 689 F.3d at 961 (the officer was told that the suspect had a weapon and did not see him discard it during the encounter or hear others yell that the suspect was unarmed; the officer did see the suspect disobey the officer's orders to drop to the ground and instead move his hand to his side, justifying the shooting); *Carr v. Tatangelo*, 338 F.3d at 1259 (11th Cir. 2003) (the suspect was hiding in the bushes outside of a crime scene and throwing rocks at the officers; the officers heard a sound similar to the chambering of a bullet, and one officer testified that he saw a gun barrel in the bushes, justifying the police shooting).

16

eyewitness testified that the suspect had his hands at his side).

In this case, Salazar has pointed to no summary judgment evidence contradicting Thompson's testimony that he shot because, when Salazar reached for his waistband and turned toward him, he believed that Salazar had a gun and would shoot.  The fact disputes that emerge from the record — the extent of the struggle before Salazar walked away from Thompson and whether Salazar turned right or left toward Thompson while reaching for his waistband — are not material to determining whether the force was excessive and do not preclude summary judgment.  Because Thompson reasonably believed that Salazar posed an immediate threat, his use of deadly force was not excessive.

Thompson's use of deadly force did not violate Salazar's clearly established constitutional rights.  Salazar has identified no case holding that the use of deadly force violates clearly established rights when an officer reasonably believes that the subject is armed and poses an immediate threat.  The clearly established law at the time of the shooting held that an officer's reasonable belief that a suspect poses an immediate threat, even if that belief turns out to be incorrect, justifies the use of deadly force.  *See Ontiveros*, 564 F.3d at 379; *Reese*, 926 F.2d at 494; *Loch*, 689 F.3d at 961.  Summary judgment is granted on the § 1983 claims against Thompson in his individual capacity.

### C.     The Conspiracy Claim

The amended complaint alleges that Thompson conspired with other Houston Police Department officers to deprive Salazar of his civil rights.  The claims against officers other than Thompson have been dismissed.  The officers were all employees of the City of Houston.  It is well established that employees of the same legal entity cannot conspire among themselves.  *See Swilley v. City of Houston*, 457 Fed. App'x 400, 404 (5th Cir. 2012) ("The City of Houston is a single legal

17

entity and, as a matter of law, its employees cannot conspire among themselves." (citing *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998)).  Summary judgment is granted dismissing the conspiracy claims.

## III.    The State-Law Claims Against Thompson in his Official Capacity

The plaintiffs allege that Thompson, sued in his official capacity, was negligent or grossly negligent when he shot Salazar, an unarmed citizen.  (Docket Entry No. 13, p. 24).  A suit against a government employee in his official capacity is a suit against the government entity.  *University of Tex. Med. Branch. at Galveston v. Hohmnan*, 6 S.W.3d 767, 777 (Tex. App. — Houston [1st Dist.] 1999, pet. dismissed w.o.j.).  Under § 101.106(a) of the Texas Civil Practice & Remedies Code, if a suit is filed against a government employee based on conduct within the scope of his or her employment and the plaintiff could have brought the claims against the government entity, the employee may move to dismiss the claims.

The plaintiffs sued Thompson in his official capacity based on what he did acting as a police officer for the City of Houston.  The plaintiffs could, and did, assert the same negligence and gross-negligence claims against the City.  (Docket Entry No. 13 at p. 24).  The state-law tort claims against Thompson are dismissed.

## IV.    The Claims Against the City of Houston

### A.    Municipal Liability Under 42 U.S.C. § 1983

Municipal liability requires proof of an underlying claim of a violation of rights and three additional elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."  *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005).  The constitutional violation of a municipal official is a prerequisite to municipal liability.  "Proper

18

analysis requires that two issues be separated when a § 1983 claim is asserted against a municipality: (1) whether [the] plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119–20 (1992).

The summary judgment evidence shows that Thompson had an objectively reasonable basis for the force he used. The plaintiffs have not raised a factual dispute material to determining whether Salazar's constitutional rights were violated. Without an underlying violation, the § 1983 claims against the municipality fail.

### B.    The Negligence Claims

The Texas Tort Claims Act waives the immunity of governmental entities when the plaintiff's injuries "have been proximately caused by the operation or use of a motor-driven vehicle or motor-driven equipment or by a condition or use of tangible real or personal property." *Holland v. City of Houston*, 41 F. Supp. 2d 678, 710–11 (S.D. Tex. 1999). Tangible property is property that is capable of being handled, touched, or seen. *Id.*

The plaintiffs allege that the City negligently trained and supervised Thompson, including by implementing the policies and procedures that led to the shooting. These claims do not involve motor-driven vehicles or tangible property. The City's immunity is not waived for these claims. *Id.* at 712.

To the extent the plaintiffs claim that the City is liable for Thompson's negligent use of a firearm, that is an intentional tort claim, not a negligence claim. *See id.* (holding that a TTCA claim based on an officer's allegedly negligent use of his service weapon was a claim for intentional tort, not negligence). The TTCA does not waive the City's sovereign immunity for intentional torts.

TEX. CIV. PRAC. & REM. CODE. § 101.057.  The City of Houston is entitled to summary judgment on this claim.

**V.     The Loss of Consortium Claims**

Salazar, suing on behalf of his wife and children, asserts state and federal law rights to recover for the loss of consortium and loss of familial society, companionship, and association.  The summary judgment record reveals no basis for recovery on either the federal or state-law claims.  These claims are dismissed.

**VI.    Conclusion**

The defendants' motion for summary judgment, (Docket Entry No. 31), is granted.  Final judgment is entered by separate order.

SIGNED on March 31, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

20